# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| In re the Matter of<br>Personal Restraint Petition of<br><br>TODD DALE PHELPS,<br><br>               Petitioner. | No.  48011-5-II<br><br><br><br><br>PUBLISHED OPINION |

JOHANSON, J. — In this personal restraint petition (PRP), Todd Dale Phelps seeks collateral review of his June 8, 2012 jury trial convictions for third degree rape and second degree sexual misconduct with a minor.  We hold that the prosecutor committed misconduct by introducing and arguing facts not in evidence about sexual grooming and that this misconduct was prejudicial, flagrant, and ill intentioned and that there was no likelihood that this error could have been cured by a proper instruction.  We further hold that this error resulted in actual and substantial prejudice.  Accordingly, we grant this PRP and reverse his convictions.

No. 48011-5-II

## FACTS

### I. BACKGROUND

#### A. 2010: RELATIONSHIP STARTS

In the summer of 2010, 16-year-old AA[1] was playing on a fast-pitch softball team that Phelps was coaching. AA frequently travelled with Phelps and his family to out-of-town games. Over time, she began to think of Phelps as a "father figure" rather than just a coach. 3 Report of Proceedings (RP) at 444.

After summer ended, AA became withdrawn and depressed, and her mother learned that AA had been cutting herself. AA started seeing a physician and a counselor. She was diagnosed with depression and was placed on antidepressants. AA seemed to improve once she received this help.

#### B. FEBRUARY THROUGH MARCH 2011: INCREASING CONFIDENCES AND CONTACT WITH PHELPS

In February 2011, AA began playing softball on her high school team; Phelps was one of her coaches. Between February and the end of March, Phelps encouraged AA to confide in him about personal issues including her marijuana use, her cutting, and her relationship with her boyfriend. Phelps and AA met frequently during softball practice and once in Phelps's home. They also once sat and talked in Phelps's car in a church parking lot after AA accompanied him to another team's game.

---

[1] We use initials instead of names for victims of sex crimes to protect their privacy. Gen. Ord. of 2011-1 of Division II, *In Re The Use of Initials or Pseudonyms for Child Witnesses in Sex Crime Cases* (Wash. Ct. App.).

As time progressed and AA had confided more in Phelps, Phelps's degree of contact with AA increased. At first, AA just confided in Phelps about her issues. Phelps then shared sexually explicit stories about himself and AA's relatives with AA. And finally, Phelps had AA show him where she cut herself, which required her to pull her pants halfway down.

Around this same time, Phelps attempted to discuss AA's issues with fellow coach Yvonne Keller; AA's youth pastor Benjamin Porter;[2] and Benjamin Porter's wife, Melody Porter. Melody Porter refused to talk to Phelps about AA. But Phelps told Keller and Benjamin Porter about talking to AA in his truck outside the church, his concern for AA, and the fact that they were communicating. Benjamin Porter told Phelps that he should not be alone with AA. Keller contacted AA's mother[3] and told her that Phelps was texting AA, that they were discussing AA's problems, and that she (Keller) thought AA was getting too attached to Phelps.

## C. APRIL 2, 2011: SEXUAL MISCONDUCT

On April 1, 2011, AA broke up with her boyfriend. She did so on Phelps's advice and AA felt that Phelps was trying to help her. Later that day, AA contacted Phelps on Facebook and told him that she had cut herself again. Phelps told her that he needed to see these new cuts.

The next day, April 2, AA lied to her mother about where she was going and went to Phelps's house to show him her cuts. Phelps had AA pull her pants down and show him her cuts on the tops of her thighs. According to AA, Phelps then had inappropriate sexual contact with

---

[2] We refer to Benjamin Porter and his wife, Melody Porter, by their full names for clarity.

[3] Keller and AA's mother were related.

her.[4] During this incident, Phelps's daughter returned for a short time, and AA hid next to Phelps's bed.

On April 3, AA told Melody Porter that Phelps had kissed her and that she had kissed him back. AA became upset when Melody Porter said that she was obligated to report the incident. When AA begged her not to report it, Melody Porter agreed to give AA a chance to report the incident herself. That same day, Phelps told Keller that he had been alone with AA at his home and that he had her put on some shorts and show him her cuts. Believing that Phelps "was crossing the lines as a coach," Keller reported this to the school counselor. 2 RP at 192.

The next day, Keller, AA's mother, and the head coach found AA in the gym alone with Phelps. Although it was not against a written policy to be alone with a student athlete, Keller was concerned because it was out of character for Phelps to be alone with players.

Sometime in early April,[5] Phelps spoke to AA's mother about his concerns about AA's cutting and low self-esteem and how he cared for AA and wanted to help her. AA's mother later testified that she found the conversation "odd" because Phelps also commented that AA had "never been kissed," which she thought went beyond what a coach should know about a 16-year-old girl. 1 RP at 46.

### D. APRIL 7 KISS AND ONGOING PHYSICAL CONTACT

On April 6, AA stayed overnight at the Phelpses' home and she slept on the couch with Phelps's daughter. The next morning, Phelps kissed AA. According to AA, his daughter

---

[4] The April 2, 2011 physical contact was the basis of the State's sexual misconduct with a minor charge.

[5] It is unclear from the record whether this was before or after April 4.

witnessed this kiss, and Phelps told his daughter that he had just kissed AA on the forehead. Although Phelps's daughter later denied having witnessed the kiss, she told a friend and a friend's mother that she had witnessed Phelps "pulling away from kissing [AA]" one morning when AA had spent the night and that Phelps had explained to her that he was just trying to be like a father to AA. 8 RP at 1458.

Also in early April, Phelps talked to Benjamin Porter about the allegations that he (Phelps) had kissed AA. Phelps said that he had just kissed AA like a daughter on the forehead and that "he believed that [AA] was a storyteller and that she was living in a fantasy world."[6] 2 RP at 247.

On April 11 or 12, AA was injured during an away game. Phelps helped AA to and from the bus by giving her a piggyback ride. Keller observed this. According to AA, at one point while carrying her, Phelps turned around so the people behind him could not see his hands and grabbed her between her legs. He also touched her thigh and kept trying to hold her hand as they sat together on the bus. AA later testified that she trusted Phelps and thought he was just being playful.

### E. INITIAL REPORTS, RESTRICTIONS, AND TERMINATION

On April 13, Melody Porter contacted AA by phone at school and told her that she needed to report the incident that AA had previously reported to her. AA left school, went to Melody Porter's workplace, and begged her not to tell because it would ruin her and Phelps's lives. But Melody Porter had AA return to school and reported to school officials that AA had told her that Phelps had kissed her on the cheek. The school contacted AA's mother, and her mother came to the school.

---

[6] Benjamin Porter later testified that he did not agree that AA was a storyteller or living in a fantasy world.

AA told the adults that Phelps had kissed her on only the forehead and the nose and that Melody Porter was making too much out of it. AA then locked herself in a bathroom stall and deleted all of the texts on her iPod before her mother could take it from her. AA later testified that she lied about the kiss being on the forehead because Phelps was her friend, she was mad at everyone, and she thought only Phelps could understand and help her.

During this time, AA and Phelps continued to have daily electronic contact. In one of their conversations, Phelps suggested that they lie and say the kiss his daughter had witnessed was just a kiss on the head. AA suggested that they say the kiss his daughter had witnessed was the one she had reported to Melody Porter.

On April 18, Phelps met with the school superintendent, Kyle MacDonald. Phelps admitted that he had been texting AA and that he had been alone in the gym with AA because he wanted to talk to her. He also told MacDonald that he was afraid he would go to jail because he failed to report AA's self-harming behavior to Child Protective Services (CPS). In an earlier informal meeting, Phelps had already admitted he had kissed AA on the forehead when she had spent the night with Phelps's daughter, held AA's hand on the bus, and sat in the church parking lot with AA. Phelps asserted, however, that he was just trying to help AA, and "it had been blown out of proportion." 3 RP at 304-05. At this point, MacDonald planned to recommend that the school board suspend or terminate Phelps.

Phelps and his wife met with AA's parents on April 18. Phelps told them that he was concerned about losing his coaching job and admitted to having kissed AA on the forehead. He

also told AA's parents all of the "secrets"[7] AA had told him. 1 RP at 51. In addition, Phelps told AA's father that he "didn't have to worry that she was not a virgin." 2 RP at 146. AA's father thought that it was surprising that a coach would bring this up.

Following this meeting, and with AA's parents' approval, the school board allowed Phelps to continue coaching on the condition that he stop texting students, not make personal phone calls to students, avoid sitting with students on the bus, and not be alone with students in isolated areas. Phelps was also required to receive additional training on staff/student boundaries.

After this, Phelps continued to have contact with AA during the games, telling her that he had never loved anyone as much as he loved her, advising her to stop going to counseling because the counselor was trying to keep them from having contact,[8] and grabbing her crotch area as others were getting off the bus during an away game. He also continued to text AA.

On April 26, one of AA's instructors discovered that AA had been texting Phelps on her iPod and reported this to MacDonald. Phelps resigned following this discovery.

F. CONTINUED CONTACT AND RAPE

After his resignation, Phelps contacted AA's family and asked to see AA, and he continued to contact AA through her own e-mail account and other people's phones. Phelps and AA also arranged to meet in person twice at or near the school in mid-to-late July.

Around July 14, Phelps contacted AA through her friend, MM, and arranged for them to meet behind the school in an area where Phelps knew there were no cameras. Phelps told AA and

---

[7] According to AA, these secrets included information about her cutting, her drug use, how she felt about reporting a friend's rape, and her sneaking out of the house.

[8] AA eventually stopped participating in counseling.

MM that people at work "were saying he was a pervert" and talked to them about his resignation and how he wanted to be able to continue to coach. 3 RP at 350. MM observed Phelps give AA a long hug when they were leaving. According to MM, although AA stopped using MM's phone to contact Phelps after this meeting, Phelps continued to contact her (MM) twice a week or more between July 14 and the end of August.

On July 21, AA and her friend KC met Phelps at the school, which was next door to Phelps's house. Phelps asked KC what she knew about his relationship with AA, and KC told him that she knew Phelps had kissed AA on the nose. Phelps told KC that he had been trying to help AA but her parents would not let them talk, that he would never hurt AA, and that AA was like a daughter to him. KC saw him hug AA tightly for about 10 seconds. Phelps told KC not to tell anyone about them meeting, but KC told her parents.

On July 27, AA lied to her parents about where she was going and met Phelps at his brother's house. According to AA, Phelps forced her to have sex with him on the floor of his brother's bedroom.

While AA was gone, KC's mother contacted AA's mother and told her that KC and AA had met with and talked to Phelps at the school. When AA returned, her parents confronted her about seeing Phelps, and AA ran to Melody Porter's house and locked herself in. Melody Porter was eventually able to get AA to come outside, and AA returned home with her parents. AA's parents again took away her electronics and grounded her. AA did not disclose the rape at this time.

G. AUGUST AND SEPTEMBER 2011: AA'S DISCLOSURES

In mid-August, AA told MM about the rape. Following this disclosure, Phelps initiated an instant-messaging (IM) conversation with MM on Facebook. MM asked him why he would "'do that to [AA],'" referring to the rape, and he responded that if MM or AA told anyone, "his life is over and he'll be dead." 3 RP at 353. Phelps sent an IM to MM late that same day and asked if they had or were going to tell anyone else; MM tried to ignore these messages.

AA's parents agreed to send AA to live with her aunt, Lisa Parente, in another town in order to keep her away from Phelps. AA agreed and moved in with her aunt on August 29. Phelps continued to ask MM about AA into September. In late September, AA called Melody Porter and told her something had happened on July 27. Melody Porter told AA to talk to Parente immediately. AA disclosed the July 27 rape to Parente. Parente took AA home, and AA told her parents that she had had "sexual contact" with Phelps. 2 RP at 158. AA's father called the sheriff.

II. PROCEDURE

The State charged Phelps with third degree rape and second degree sexual misconduct with a minor. *State v. Phelps*, noted at 181 Wn. App. 1034, 2014 WL 2795966, at *2, *review denied*, 181 Wn.2d 1030 (2015). The case proceeded to a jury trial.

A. VOIR DIRE

During voir dire, the State, without objection, introduced the concept of grooming and discussed the concept at length with nine of the potential jurors:

> [PROSECUTOR]: Now, has anyone here heard in the realm of sexual assault, rape, child molestation, anything like that, has anyone heard of the word grooming? Raise your hand, please.
> Number 10, grooming, what does that mean to you?
> JUROR NO. 10: Grooming, the context I'm thinking of is grooming of a victim to be assaulted.

[PROSECUTOR]: Okay. Can you elaborate a little bit for me?

JUROR NO. 10: Well, yeah. Spending time with the child or with the -- you know, with the victim, gaining trust of the victim, basically preparing the victim to make the next move.

[PROSECUTOR]: Okay. Did everybody hear that? Anybody not hear it?

Okay. Number 8, you raised your hand. You want to add something to that?

JUROR NO. 8: Not really. I think it's a trust issue. You know, the victim trusts the person. That's how they get started.

[PROSECUTOR]: So it's a trust relationship.

JUROR NO. 8: Right.

[PROSECUTOR]: Until what point?

JUROR NO. 8: Until something happens that they distrust them. Something would have to happen to make -- essentially with a child, you know, because children, they pretty much trust everybody.

[PROSECUTOR]: Okay. Well, how's the trust built? Raise your hand. Number 9?

JUROR NO. 9: Well, could establish a relationship with the family, doesn't have to be just the victim, be the victim's family, just get everybody to trust in you. Said something about a six-year-old before. If a six-year-old said they did this, number 3, nobody would believe them. This perpetrator has gained the trust of the people around the victim.

[PROSECUTOR]: Right. Okay. So is that part of the process, the perpetrator when they're grooming not just the victim but other folks around the victim maybe? Just what you said --

JUROR NO. 9: Well, I suppose it could be. I don't know.

[PROSECUTOR]: Well, how else is trust gained? There were quite a few of you back there raised your hand. Way in the back, 46?

. . . .

JUROR NO. 46: Taking the child out to activities and doing fun things with them, and hanging out with the parents, gain trust.

[PROSECUTOR]: Okay. What about -- number 29, what about victims that are groomed for sexual acts, are they ever isolated, do you know, from other people?

JUROR NO. 29: Possible.

[PROSECUTOR]: Okay. How would that happen? How would that happen?

JUROR NO. 29: I don't know.

[PROSECUTOR]: Number 39?

JUROR NO. 39: One on one.

[PROSECUTOR]: What do you mean one on one?

JUROR NO. 39: Like a person would take the other person one on one somewhere, do stuff with them one on one instead of being in a group or with a whole bunch of people.

10

[PROSECUTOR]:  Okay.  Now, but what about isolating them from their other friends?  Is that something that . . . I'm just throwing these out here, I mean, if you're not familiar with any of these.  But please speak up if you are.

Number 21, is that a -- if you're grooming someone and you're trying to gain a trust relationship to groom them, is it possible that you're going to try to isolate that victim from the other people that victim trusts in their life?

JUROR NO. 21:  Yeah.

[PROSECUTOR]:  And how would that happen?  Can you think of anything where -- how you going to accomplish that?

JUROR NO. 21:  Try to turn their friends against them.

[PROSECUTOR]:  Okay.  And their family maybe?

JUROR NO. 21:  Yes.

[PROSECUTOR]:  Or maybe their boyfriend or something like that?

JUROR NO. 21:  Yes.

[PROSECUTOR]:  Does anyone disagree with that?  Number 30?

JUROR NO. 30:  I agree with what he said.

[PROSECUTOR]:  Does that make sense to you?

JUROR NO. 30:  It makes a lot of sense to me.

[PROSECUTOR]:  Number 7, does that make sense to you?

JUROR NO. 7:  Yes.

[PROSECUTOR]:  Do you agree with that?

JUROR NO. 7:  Yes, I do.

[PROSECUTOR]:  Does anyone have any special training with regard to this area, grooming, background in psychology, anything like that?[9]

Okay.  I'm almost done.  Okay.

1 RP (Apr. 17, 2012) at 113-17.  Defense counsel did not object to this line of questioning.

## B.  STATE'S EVIDENCE

### 1.  GROOMING TESTIMONY

The State's witnesses testified consistently with the facts described above.  The State did not present any expert or lay testimony about the grooming process.  There were only two instances during the trial that the term "grooming" was mentioned in testimony.

---

[9] Nothing in the record shows how the potential jurors responded to this question.

First, when cross-examining AA's father, AA's father agreed that Phelps had spoken with AA's mother about his being concerned about AA's mental health before the April 18 meeting. But AA's father also commented that he did not "agree with that" and stated, "I don't agree that was his intentions." 2 RP at 179. On redirect, the State asked AA's father what he thought Phelps's intentions were. AA's father responded, "I believe his intentions were dishonorable. *I believe he was grooming her to the end result of what he did*. He ended up raping her on the 27th." 2 RP at 180 (emphasis added). Phelps objected on grounds of speculation when the State asked AA's father what he thought Phelps's intentions were, but the trial court overruled the objection. Phelps did not object when AA's father mentioned grooming.

Second, during the State's redirect of Keller, the State asked her if she "believe[d]" Phelps was "grooming" AA. 2 RP at 210. Phelps objected as to "her belief." 2 RP at 211. The trial court sustained the objection. The State then asked if Keller "kn[e]w anything about grooming." 2 RP at 211. Phelps objected, arguing irrelevancy. The trial court stated, "That's an issue that is for expert testimony. She is not an expert. She's already stated she's not an expert. So I'm sustaining the objection." 2 RP at 211.

2.   OTHER TESTIMONY

In addition to the facts set out above, several of the State's witnesses testified in more detail about their observations of Phelps and AA's relationship. Much of this testimony was consistent with AA's testimony, but other than Phelps's daughter observing one kiss, no one observed any overtly sexual contact. It also demonstrated that several adults found Phelps's contact with AA to be inappropriate and that Phelps was also in contact with some of AA's friends.

12

Of particular interest was MM's father's testimony. MM's father, who worked with Phelps, testified that Phelps talked about AA all the time at work, that Phelps had told him AA had "some skeletons in the closet," and that Phelps was "trying to help [AA] out." 3 RP at 389. MM's father told Phelps to leave AA alone because he was a truck driver, not a counselor. Phelps also told MM's father that he frequently texted AA, which MM's father found unusual. MM's father had noticed the texting as early as the beginning of 2011.

Phelps also told MM's father about his suspension and how Melody Porter had reported that he had kissed AA on the forehead. Phelps stated that "if they found his texts, his life would be over with." 3 RP at 392. He testified that Phelps appeared to be relieved when he learned the texts had been deleted and were not retrievable. Phelps also told MM's father that he had seen AA's cuts when they were alone at his home and mentioned that one of his daughters had been at home but had left. Phelps told MM's father that he had AA put on a pair of his daughter's shorts so he could see the cuts on AA's upper thigh. Phelps also told MM's father that he had gotten AA to break up with her boyfriend.

In addition, Phelps told MM's father that he (Phelps) had done research on the internet and that he was able to control AA's emotions. MM's father stated that Phelps appeared to be bragging about this and referred to himself as "Dr. Todd." 3 RP at 400. MM's father stated that he told Phelps to leave AA alone about 50 times, sometimes commenting that it was not his place to try to help AA because he was a truck driver and not a counselor, but Phelps seemed obsessed with AA and unable to leave her alone.

### C. CLOSING ARGUMENTS

#### 1. STATE'S CLOSING ARGUMENT

In closing argument, the prosecutor discussed some of the topics that he questioned the jurors about during voir dire, including the grooming process:

> Then we talked about grooming. We talked about the process of grooming. And some people came up with examples of how someone who is grooming is going to be nice. They are going to try to get the trust of someone. They are going to try and isolate that person so that they can do an act against this person who is being groomed. And it's not just the person who is being groomed, but it's other people that are around as well that are being groomed.

8 RP at 1493.

The prosecutor then turned to the facts of the case. The prosecutor described the evidence showing that Phelps's relationship with AA started out with Phelps and his family spending time with AA and making her feel part of their family. The prosecutor then explained how the evidence showed that the relationship started to change as Phelps began meeting alone with AA, isolated AA by having her break up with her boyfriend and telling her unflattering stories about her family members, and engaging AA in personal, sexually-oriented conversations. The prosecutor discussed how Phelps gradually introduced physical contact into his relationship with AA, which culminated in Phelps having sexual contact and then sexual intercourse with AA. The prosecutor also emphasized that Phelps continued to have frequent contact with AA even after he was told to cease his contact with AA and was forced to resign from coaching.

The prosecutor referred to the concept of grooming throughout his argument. For example, after talking about the alleged physical contact that occurred before the rape, the prosecutor argued,

> What is all this stuff that's going on? What is all this physical contact between a coach and a student athlete? It's grooming; it's okay, every time I touch you, it's okay, it's okay. Eventually, it becomes the norm. The grooming isn't in

14

the open, folks. When people groom, they don't do it so everybody can see. That's not the way it works. It wouldn't be called grooming. It would be called a crime because he'd be caught all the time.

8 RP at 1506-07.

The prosecutor also questioned why Phelps, who was a mandatory reporter,[10] spoke to AA's parents about AA only after it became apparent that people knew about his contacts with AA and he was suspended for the contact, and concluded that Phelps was also grooming those around AA:

But at this point, [Phelps] decides to meet with his wife, [AA], and [AA's] parents. Why? Why now is it so important that they discuss [AA's] issues? Well, guess who is being groomed now? [AA's] been groomed for the last month or so. But guess who is being groomed now? Everybody else. Everybody else because everybody else is now going to learn that, hey, it's not me that's acting inappropriate. It's not me who is the adult here and has a responsibility to make sure that nothing like this happens with a student athlete. It's [AA]. She is the suicidal person.

8 RP at 1509.

The prosecutor also introduced the concept of grooming when discussing AA's behavior when he touched her inappropriately on the bus:

She gets up, walks to the front of the bus, and turns and steps in the very front seat. And she's got her rear facing the defendant. And what does he do? He leans into the seat, and it's dark out, and he takes his hand and puts it between her legs. Again, grooming. He already knows she's not going to respond.

8 RP at 1513.

In addition to commenting about Phelps's grooming of AA, the prosecutor also argued that many of Phelps's actions could be explained as his grooming AA's friends, family, and others.

---

[10] Whenever a coach knows a child is in danger or hurting themselves, protocol requires it be reported immediately to the athletic director.

For example, the prosecutor commented that Phelps had also started to have contact with AA's friend MM to "groom" her, "just like he was grooming everybody else, that these issues are [AA's], and he's not a bad guy." 8 RP at 1518.

The prosecutor further discussed how the grooming process took place over time and that, as part of it, Phelps told AA stories about how his wife refused to sleep in the same bed with him, how his wife had made out with another man, and other statements about his wife that were attempts to make AA sympathetic to him. The prosecutor then commented about Phelps's sexual comments to AA and his physical contact with her, stating that "[t]hese are the things that are going on that she's being told and groomed with throughout their contacts." 8 RP at 1522.

After discussing MM's father's testimony about Phelps bragging about his ability to control AA's emotions, the prosecutor argued,

> So let me talk about grooming again. At this point, point of the rape, [AA] is pretty much isolated from her entire family until she eventually is allowed to move with her aunt. Remember the stories about her family, her grandma, her cousin, her aunt. She's told these sex stories by the defendant. She's told to break up with her boyfriend, don't talk to your counselor. The defendant is meeting with her in private with other students, but no adults around. He has made her feel important throughout this entire incident. She felt he was the only one she could talk to.

8 RP at 1537-38.

The prosecutor also mentioned grooming in the context of AA's credibility:

> So I want to talk about the credibility of [AA]. . . .
> I want you to consider [AA's] environment, okay, when she went through all this. She's depressed. She's not getting along with her family at the time. She has low self-esteem. That's not an issue. Nobody disagrees with that. She's a prime candidate for grooming, to be manipulated. And that's exactly what happened in this case.

8 RP at 1540.

16

After discussing how AA's overall testimony was consistent, the prosecutor commented that Phelps's witnesses are also victims. For example, when talking about why Phelps's daughter might be trying to protect him, the prosecutor stated, "She says [AA's] obsessed with her dad. Maybe that might be true. Maybe she was. But she's being groomed." 8 RP at 1542.

In summing up his argument, the prosecutor argued,

> So why are we here? We're here because of grooming, we're here because of deceit, concealment, half-truths, misrepresentations. And there's only one adult in this entire case who had control over everything that happened in this case. One person who had the control and the authority to control the flow of information and the people involved. And that's that guy right there.

8 RP at 1548.

Finally, in discussing the lack of physical or electronic evidence, the prosecutor commented,

> The iPod texts deleted, again, by [AA] to protect him. So where are we at? So now we're in a position where [AA] has to pay because she tried to protect him. Do you know what this is called? It's called grooming. And she was groomed well.

8 RP at 1549.

In addition to presenting argument about grooming, the prosecutor also displayed eight slides that referred to grooming during his closing argument. These slides include statements telling the jury that (1) grooming involves being nice to a person, developing trust, isolating that person, and testing boundaries; (2) grooming behavior never takes place in the open; (3) Phelps is not just grooming AA, he is also grooming others around AA; and (4) AA should not pay for protecting Phelps because she was groomed. In addition, one of these slides summarized the alleged grooming behaviors. Phelps did not object to any of these slides.

17

2.      DEFENSE CLOSING ARGUMENT

In his closing argument, defense counsel presented two theories to the jury. First, that Phelps could not have committed the crimes because he was not there. And second, even if Phelps had intercourse with AA, AA consented.

Defense counsel focused largely on potential inconsistencies in AA's timeline when compared to the phone records, other potential inconsistencies between AA's testimony and the testimony from other witnesses, and the lack of forensic evidence. Defense counsel also responded to the State's claim that Phelps's contact with others about AA was an attempt to groom them by asserting that Phelps's contacts were just another manifestation of his concern for AA. In addition, defense counsel argued that Phelps may have continued his contact with AA because no one "actually acted" on the information he shared, likely because they knew AA "did stuff like this," and AA was just seeking attention. 8 RP at 1566-67.

3.      STATE'S REBUTTAL

In its rebuttal, the prosecutor challenged defense counsel's assertion that AA consented to the sexual intercourse, noting that she testified that she said no to Phelps several times during the rape, even if she did not continue to do so once the rape was in progress. The prosecutor then commented on defense counsel's argument about the fact that AA said Phelps told her that he needed help getting an erection at the time of the rape being inconsistent with Phelps's prior alleged statements to AA about how she frequently caused him to have erections when he was near her:

> Now, this erection issue, this is entertaining to me. Words are different than actual conduct. Is it possible that he is grooming a young woman and telling her that when I watch you bat in catches [sic], I have to wear sweats because I get an erection? Does it mean he actually had one? No. Well, we know he probably did, though.

8 RP at 1588.

The prosecutor again mentioned grooming behavior when commenting on the defense

argument that Phelps was just acting out of concern for AA:

> As concerned as the defendant was for [AA], not one time, we haven't heard any information that he ever called CPS, that he ever called law enforcement, nothing.  That's how concerned he was.  *He was grooming everybody else.* Remember, he was the one that was putting out the severe information that she was going to commit suicide.  Everybody else was familiar with it.  And he was the one telling his family, hey, this is a real big deal.  Think it was played up quite a bit.

8 RP at 1591 (emphasis added).  At no point during closing argument did Phelps object to any of

the prosecutor's comments about grooming.

## D.  VERDICT AND DIRECT APPEAL

The jury found Phelps guilty of second degree sexual misconduct with a minor and third

degree rape.  Phelps appealed, and this court affirmed.[11]  Phelps's direct appeal mandated January

16, 2015.  Phelps filed this timely PRP in August 2015.[12]

## ANALYSIS

### I.  PRP STANDARDS

"A [PRP] is not a substitute for direct appeal and availability of collateral relief is limited."

*In re Pers. Restraint of Grasso*, 151 Wn.2d 1, 10, 84 P.3d 859 (2004).  In most cases, to be entitled

to relief, the petitioner must show either a constitutional error that resulted in actual and substantial

prejudice or a nonconstitutional error that constituted a fundamental defect that inherently results

---

[11] Although Phelps raised prosecutorial misconduct and ineffective assistance of trial counsel claims in his direct appeal, the basis of these claims were not the same as the claims he now raises in this PRP, so his current claims are not precluded by his previous arguments.  *See Phelps*, noted at 181 Wn. App. 1034; *In re Pers. Restraint of Khan*, 184 Wn.2d 679, 686, 363 P.3d 577 (2015).

[12] RCW 10.73.090(1).

in a complete miscarriage of justice. *In re Pers. Restraint of Cook*, 114 Wn.2d 802, 812, 792 P.2d 506 (1990); *see also Grasso*, 151 Wn.2d at 10.

## II.  PROSECUTORIAL MISCONDUCT

Phelps argues that the prosecutor committed misconduct by introducing the concept of grooming in closing argument without any evidentiary support or foundation.  He is, in effect, arguing that the prosecutor argued facts outside the record.  The State responds that the grooming argument was based on reasonable inferences from the record.  We agree with Phelps and hold that he also has established that this constitutional error resulted in actual and substantial prejudice.[13]

### A.  PROSECUTORIAL MISCONDUCT STANDARDS

The Sixth Amendment to the United States Constitution guarantees a defendant a fair, but not an error-free, trial.  *State v. Fisher*, 165 Wn.2d 727, 746-47, 202 P.3d 937 (2009).  The burden to establish prosecutorial misconduct is on the defendant, who must show that the prosecuting attorney's conduct was both improper and prejudicial.  *Fisher*, 165 Wn.2d at 747.  Prosecutorial misconduct is grounds for reversal only when there is a substantial likelihood that the improper conduct affected the jury.  *Fisher*, 165 Wn.2d at 747.  In analyzing prejudice, we examine the allegedly improper conduct in the context of the total argument, the issues in the case, the evidence, and the jury instructions.  *State v. Yates*, 161 Wn.2d 714, 774, 168 P.3d 359 (2007).

---

[13] Phelps also argues that the prosecutor engaged in misconduct by introducing grooming evidence that was inadmissible profiling evidence.  Because we grant relief on another ground, we do not reach this argument.

Failure to object to the misconduct at trial constitutes waiver on appeal unless the misconduct is so flagrant and ill intentioned that it evinces an enduring and resulting prejudice and this prejudice cannot be cured by a jury instruction. *Fisher*, 165 Wn.2d at 747. Phelps did not object to the prosecutor's references to grooming in closing argument, nor did he object to the prosecutor's descriptions of several of Phelps's actions as grooming behaviors.

### B. POTENTIAL MISCONDUCT

In the context of closing arguments, the prosecutor has wide latitude in making arguments to the jury and prosecutors are allowed to draw reasonable inferences from the evidence. *State v. Gregory*, 158 Wn.2d 759, 841, 860, 147 P.3d 1201 (2006), *overruled on other grounds by State v. W.R., Jr.*, 181 Wn.2d 757, 769, 336 P.3d 1134 (2014)). "We review allegedly improper comments in the context of the entire argument." *Fisher*, 165 Wn.2d at 747. References to evidence outside of the record constitute misconduct. *Fisher*, 165 Wn.2d at 747.

Here, the prosecutor repeatedly argued that Phelps "groomed" AA and those around her. He also argued or implied that Phelps's "grooming" allowed him to not only develop a trust relationship with AA to facilitate a sexual relationship with her, but (1) to keep AA from reporting the crimes, (2) to provide an innocent explanation for his extensive contact with AA, and (3) to attempt to damage AA's credibility by giving others reason to doubt what she said. The State acknowledges that the grooming argument went beyond asserting that the grooming behavior was intended to facilitate a sexual relationship with AA, noting that "[t]he deputy prosecutor's argument using the word 'grooming' was to explain the behavior of Phelps[;] how he manipulated everyone[;] how he sought to single out, win over and victimize AA" and that Phelps was

manipulating not only AA, but "all on the outside, her family and others." Resp. to Personal Restraint Pet. at 25.

To determine whether the prosecutor's grooming arguments were improper, we must first address whether expert evidence of grooming was required or whether the grooming process as argued here was within the jury's common understanding.

1.    EVIDENTIARY REQUIREMENT

Whether the State must present expert testimony about the grooming process or whether the grooming process is within the jury's common understanding so no evidence is required appears to be an issue of first impression in this State.  We hold that expert testimony is required if the State intends to rely on the grooming process to prove and argue its case.

Phelps cites *State v. Braham*, 67 Wn. App. 930, 841 P.2d 785 (1992), *State v. Akins*, 298 Kan. 592, 315 P.3d 868 (2014), *State v. Berosik*, 2009 MT 260, ¶ 42, 352 Mont. 16, 214 P.3d 776, *State v. Sorabella*, 277 Conn. 155, 211-14, 891 A.2d 897 (2006), *Morris v. State*, 361 S.W.3d 649, 659-62 (Tex. Crim. App. 2011), and *Jones v. United States*, 990 A.2d 970 (D.C. 2010), to support his argument that expert testimony was required.  These cases establish that expert testimony on grooming is allowed.  And they suggest, but they do not expressly hold, that it may be required under some circumstances.

For example, in *Berosik*, the court stated that the expert's testimony, which provided "general information about grooming; that is, the process of eroding a victim's boundaries to physical touch and desensitizing them to sexual issues," "concerned a subject about which lay persons would have little or no experience." *Berosik*, 2009 MT 260, ¶ 42.  Similarly, in *Jones*, the District of Columbia Court of Appeals considered whether expert testimony about grooming was

allowed. 990 A.2d at 978. Jones argued that the trial court had erred when it concluded that expert witness testimony about grooming was "'beyond the ken'" of the average juror. *Jones*, 990 A.2d at 978. The *Jones* court concluded that the trial court had not abused its discretion in admitting the expert testimony and commented that "[t]he testimony helped to explain not only how a child molester could accomplish his crimes without violence, but also why a child victim would acquiesce and be reluctant to turn against her abuser." 990 A.2d at 978. These cases suggest that it is unlikely a jury would have a nuanced understanding of the significance of grooming and that expert testimony would be vital.

*Morris* is also instructive. In *Morris*, the Texas Court of Appeals addressed the admissibility of expert testimony in greater depth when addressing whether grooming testimony by a law enforcement officer had been properly admitted. *Morris*, 361 S.W.3d at 653-54. The court considered "whether 'grooming' has been established as a phenomenon[,] . . . what kind of expertise is required to recognize that phenomenon," and whether a law enforcement officer could testify on the subject. *Morris*, 361 S.W.3d at 656. In addressing whether grooming was a phenomenon recognized by the courts, the court noted that grooming was a common issue before the courts and that a review of state and federal cases made clear that the concept of grooming was recognized. *Morris*, 361 S.W.2d at 657-61. The court commented, "A few of these opinions have specifically upheld the admission of expert testimony on the subject, but many more have referred to the concept of grooming in a way that contributes to the conclusion that it is a well-recognized phenomenon." *Morris*, 361 S.W.3d at 661 (footnote omitted).

The *Morris* court then considered whether testimony about "the grooming phenomenon [was] just common knowledge" or whether it would be useful to the jury to hear expert testimony

on the subject. 361 S.W.3d at 668. The court held that "we find the weightier and more persuasive authority to be that expert grooming testimony is useful to the jury." *Morris*, 361 S.W.3d at 669. It commented,

> Although it may be true that many jurors will be aware of the concept of grooming (in practice if not necessarily by name), *that does not mean that all jurors will be aware of the concept or that the jurors will have the depth of understanding needed to resolve the issues before them.*

*Morris*, 361 S.W.3d at 669 (emphasis added). *Morris* suggests that to fully understand grooming testimony, expert testimony is generally required.

Similarly, *Akins*, a Kansas Supreme Court case, which is the case most on point legally and factually to this case, holds that expert testimony is "typically require[d]" when introducing grooming in the context of sexual abuse.[14] 298 Kan. at 604. Thus, as a whole, these cases support Phelps's argument.

The State, in contrast, does not cite to any case law establishing that expert testimony on grooming is not required. Instead, it argues that the concept of grooming was within the jury's common understanding, as demonstrated during the discussion in voir dire and dictionary definitions.

---

[14] *See also State v. Sena*, 2008-NMSC-053, ¶ 21, 144 N.M. 821, 192 P.3d 1198 (expert testimony about grooming was not required under the facts of the case because the grooming evidence was introduced to show sexual intent, a concept the jury would be familiar with, but acknowledging that expert testimony could be required if the grooming evidence had been intended as proof of the fact that the defendant had groomed the child and it was necessary for the jury to understand how the theory of grooming applied to the case).

Although the discussion of grooming in voir dire demonstrates that some of the jurors in this case had some general knowledge of grooming,[15] this does not demonstrate that the jurors had the nuanced understanding of the grooming process that would enable them to understand its effect on things such as AA's failure to report and how the grooming process may be used to influence others in order to increase the defendant's credibility or undermine the victim's credibility. The psychological complexities in understanding and evaluating the grooming process demand expert testimony to aid the jury.

The State also argues that the concept of grooming is within the jury's common understanding because "groom" is a common term that can be found in many dictionaries and, "[u]nder a broad definition it means, 'to get into readiness for some specific objective,'" demonstrating that grooming is within the jury's common understanding. Resp. to Personal Restraint Pet. at 21 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1001). The State further acknowledges a more "refined definition in regards to the behavior and children can be found, 'the criminal activity of becoming friends with a child, especially over the internet, in order to try to persuade the child to have a sexual relationship.'" Resp. to Personal Restraint Pet. at 21 (quoting CAMBRIDGE ADVANCE LEARNERS DICTIONARY & THESAURUS, http://dictionary.cambridge.org/us/dictionary/english/grooming last visited Jan. 27, 2016). The State contends that the prosecutor used the concept of grooming here in a manner consistent with

---

[15] Four of the jurors who actively participated in the voir dire discussion about grooming were selected as jurors; one was selected as an alternate juror. It does not appear that the others selected as jurors engaged in the discussion about grooming.

these definitions—to show that Phelps "was getting AA ready for an objective, to sexually assault her."[16] Resp. to Personal Restraint Pet. at 21.

But the State reads the prosecutor's argument too narrowly; its argument went well beyond arguing that Phelps was preparing AA for a sexual relationship and referred to other, more nuanced aspects of grooming such as the fact that it can explain delayed reporting and that the grooming behavior may extend beyond the defendant's direct relationship with the child and affect credibility determinations.[17] Thus, the dictionary definitions alone do not establish that the grooming concept was within the jury's common understanding.

Because the prosecutor's grooming argument encompassed issues that are beyond the jury's common understanding, Phelps is correct that the prosecutor should have presented expert testimony on this matter if the State wished to rely on these concepts in closing argument.

2.     ARGUING FACTS NOT IN EVIDENCE

Phelps argues that the prosecutor's use of the grooming concept in closing argument without first presenting testimony about the grooming process was misconduct. We agree.

---

[16] This statement contradicts the State's later statement that "[t]he deputy prosecutor's argument using the word 'grooming' was to explain the behavior of Phelps[;] how he manipulated everyone[;] how he sought to single out, win over and victimize AA," and that Phelps was manipulating not only AA but "all on the outside, her family and others." Resp. to Personal Restraint Pet. at 25.

[17] We note that it appears the State attempted to present additional evidence about the grooming process through Keller but that the trial court excluded this testimony because Keller was not an expert. The State does not cross appeal this ruling. The State's attempt to present additional evidence on the grooming process suggests that it believed the jury needed assistance understanding the grooming concept.

Although the record contains evidence of Phelps's and AA's actions and behaviors, the sole mention of grooming in evidence was AA's father's bare assertion that Phelps was "grooming" AA to facilitate sexual contact. Even presuming that this statement was sufficient to allow the State to argue that Phelps had been grooming AA for a sexual relationship, there was no evidence of any kind before the jury explaining the grooming process, the potential purposes of grooming beyond achieving a sexual relationship with AA, or the effects of grooming on those around AA. As discussed above, the State was required to present expert testimony on this aspect of the grooming process and these concepts were not within the common understanding of the jury. So the prosecutor was arguing facts that were not in evidence.

Furthermore, *Akins* supports Phelps's arguments that the prosecutor's closing argument, particularly when considered with his comments about grooming in voir dire, were improper. *Akins* is factually similar to this case because it involved a prosecutor repeatedly arguing that the defendant had groomed the alleged victims in preparation for acts of sexual abuse without having first presented any evidence about the grooming process. 298 Kan. at 604. The *Akins* court held that by presenting this argument without first presenting any evidence about the grooming process, the prosecutor was arguing facts not in evidence and this was tantamount to allowing the prosecutor to act as an unsworn witness. 298 Kan. at 605.

The State argues that *Akins* is not directly on point. It asserts that *Akins* is inapplicable because (1) the *Akins* court held that expert testimony was required before admitting grooming testimony, (2) the court also found that the prosecutor had alleged that the grooming satisfied the essential element of sexual intent at the time of the alleged conduct, and (3) here, apparently referring to AA's father's testimony, there was some testimony about grooming. But the State

failed to present *any* evidence to ensure that the jury understood the broader implications of Phelps having groomed AA. Thus, this case is similar to *Akins* in that respect. And although AA's father's testimony provided a conclusory statement that grooming had occurred, the State did not present evidence about the more nuanced aspects of the consequences of grooming that were a significant part of the prosecutor's closing argument.

Thus, AA's father's testimony does not alter the fact that the prosecutor presented argument about facts that were not before the jury. The State is, however, correct that, unlike in *Akins*, the prosecutor did not argue that the grooming activity satisfied an essential element. But this factor appears to be more relevant to whether any potential error is prejudicial than whether the prosecutor argued facts outside the evidence. Accordingly, we hold that the prosecutor improperly argued facts not in evidence.

### C. FLAGRANT, ILL-INTENTIONED, AND INCURABLE PREJUDICE

The State argues that Phelps waived his prosecutorial misconduct argument because he did not object at trial. We disagree.

To fully examine whether the prosecutor's improper conduct was so prejudicial that it could not be cured by a jury instruction, we examine the allegedly improper conduct in the context of the case as a whole. *Yates*, 161 Wn.2d at 774 (when analyzing prejudice, this court examines the allegedly improper conduct in the context of the total argument, the issues in the case, the evidence, and the jury instructions). The State did not present any evidence about the grooming process. Yet, despite not having presented any testimony, expert or lay, about the grooming process, the prosecutor repeatedly argued that Phelps engaged in grooming behavior to influence AA and others and characterized Phelps's conduct as grooming to rebut Phelps's exculpatory

statements about his reasons for his contact with AA. Although the prosecutor had discussed the grooming process in voir dire, given the testimony, including the fact that the trial court precluded him from introducing evidence from Keller about the grooming process, the prosecutor had to be well aware that there was no *evidence* about the grooming process before the jury. Thus, the prosecutor's improper conduct was flagrant and ill intentioned.

The prosecutor's argument, without any evidentiary support, was also clearly prejudicial because it touched on credibility determinations that were key to this case given the circumstantial nature of the case and the lack of direct evidence of the criminal acts. The prosecutor's argument focused on how Phelps's grooming behaviors affected AA's behavior and how those around AA perceived AA. It also was intended to rebut Phelps's claims that his contact with AA was merely an innocent attempt to help a troubled young woman. Thus, this argument had a strong relationship to AA's and Phelps's credibility and potentially influenced the jury's credibility determinations.

In this case, although there was a lot of direct evidence about Phelps's nonsexual contacts with AA other than the one brief kiss Phelps's daughter observed, there was no direct evidence of the charged sexual contact other than AA's testimony or statements AA made to others. Thus, AA's and Phelps's credibility were central to this case. By introducing the concept of grooming, the State was attempting to show that Phelps's statements to others and his innocent explanations regarding his contact with AA were for the purpose of facilitating his improper relationship with AA and could not be believed. Given that the prosecutor's references to grooming were woven throughout his closing argument (and emphasized with eight slides), these arguments could have affected the jury's credibility determinations. Because credibility was central to this case, it appears that this improper argument was flagrant and prejudicial.

We next turn to whether any resulting prejudice could have been cured by a jury instruction. We hold that Phelps has shown that the prejudice could not have been cured by an instruction. The prosecutor referred to the grooming process throughout his argument and emphasized this argument by showing several slides relating to the grooming process. Given the pervasiveness of the argument and the potential prejudice, it is unlikely a curative instruction would have had any effect. *See In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 707, 286 P.3d 673 (2012) ("'[T]he cumulative effect of repetitive prejudicial prosecutorial misconduct may be so flagrant that no instruction or series of instructions can erase their combined prejudicial effect.'" (alteration in original) (quoting *State v. Walker*, 164 Wn. App. 724, 737, 265 P.3d 191 (2011), *remanded*, 175 Wn.2d 1022 (2012))).

The State argues that there is no incurable prejudice because the jury was instructed that counsels' statements were not evidence. Although the jury was so instructed, the prosecutor began discussing the concept of grooming with the jury in voir dire and presented his grooming argument as if it were evidence throughout his argument. The repeated and pervasive use of the grooming concept makes it less likely that the jury followed this instruction, particularly when the grooming evidence was relevant to the core credibility issues in a case with no direct evidence of the actual crimes. Thus, Phelps has established prosecutorial misconduct.

Furthermore, Phelps also shows that this error resulted in actual and substantial prejudice.[18] Again, the prosecutor's improper argument was pervasive and it is unlikely that a curative instruction would have had any effect. That, coupled with the strong likelihood that this argument could have affected the jury's credibility determinations and the importance of credibility to this case, demonstrates that Phelps suffered actual and substantial prejudice.

Accordingly, we grant this PRP and reverse his convictions.

JOHANSON, J.

We concur:

BJORGEN, C.J.

LEE, J.

---

[18] Following our Supreme Court's decision in *Glasmann*, it is unclear whether a petitioner raising a prosecutorial misconduct argument in a PRP must meet the heightened standards of a PRP. In *Glasmann*, our Supreme Court addressed a prosecutorial misconduct claim in a PRP under the direct appeal standards without mentioning the PRP prejudice requirements, but the court did not expressly state that the PRP standard does not apply in this context. 175 Wn.2d at 704-05. Because the standard is not clear, we hold that Phelps meets both the direct appeal and the PRP standards.