# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 48416-1-II |
| Respondent, | |
| v. | |
| LOGAN JOSEPH NEWLAND, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — Logan Joseph Newland was convicted of three counts of third degree rape of a child.[1]  On appeal, Newland argues that (1) his counsel provided ineffective assistance by failing to object to the testimony presented on the "grooming" process; (2) the trial court violated his due process rights when it sustained objections during the defense's closing argument that potentially limited the defense's argument; (3) the trial court violated his rights against double jeopardy by failing to instruct the jury that each of the charges needed to be based on a separate and distinct act; and (4) this court should decline to award appellate costs to the State if the State substantially prevails.  We affirm.

---

[1] RCW 9A.44.079 states:

> (1) A person is guilty of rape of a child in the third degree when the person has sexual intercourse with another who is at least fourteen years old but less than sixteen years old and not married to the perpetrator and the perpetrator is at least forty-eight months older than the victim.

> (2) Rape of a child in the third degree is a class C felony.

FACTS

A.    UNDERLYING FACTS

In the late spring or summer of 2013, Newland met M.M.E.[2] at church. After that, M.M.E. "friended him on Facebook." 1 Verbatim Transcript of Proceedings (VTP) at 73. The same day that they became "friends" on Facebook, they began communicating through Facebook's private messaging feature and agreed to meet late that night. M.M.E. did not remember whose idea it was to meet that night, but she said, "I kind of guessed" that "we were going to have sex [b]ecause we were talking dirty to each other." 1 VTP at 74.

M.M.E. lived with her grandmother and told Newland to meet her at the "High Valley 8 sign" in Packwood, Washington that night "[a]fter [her] grandma went to bed, so 11, 12." 1 VTP at 76. M.M.E. snuck out and walked to the High Valley 8 sign.

Newland met M.M.E. at the High Valley 8 sign. The two walked down by the river, where Newland laid out a blanket, and the two shared vodka and soda that Newland brought. After finishing the vodka, Newland and M.M.E. had sex. In the early morning hours, Newland and M.M.E. walked back towards M.M.E.'s house, parting ways at the corner because M.M.E. did not want her grandmother to see Newland.

Newland and M.M.E. continued to communicate through Facebook's messaging feature that day and agreed to meet up again that night. They agreed to meet at the same time at the High Valley 8 sign. When they met up later that night, or in the early morning hours of the next day, they walked to the same place by the river and had sex a second time.

---

[2] M.M.E. was born on December 23, 1998. She was 14 years old between July 2013 and December 2013, when she turned 15 years old. Per General Order 2011-1 of Division II, http:www.courts.wa.gov/appellate_trial_courts, we refer to the minor victim by using initials.

M.M.E. estimated that in the first couple of days after becoming "friends" on Facebook, she and Newland exchanged "maybe a thousand" messages. 1 VTP at 100. Of the approximately 1,000 messages, M.M.E. ultimately erased all but about 400.

M.M.E. decided she did not want to see Newland again. But a month or more later, she sent him a message saying she wanted to see him. They agreed to meet at the house where Newland was house-sitting. M.M.E. rode her bike to the house. She remembered it being cold outside. At the house, Newland made her a cup of coffee and began kissing her. Newland led M.M.E. to a trailer in a shed near the house "because he didn't want his brother to hear." 1 VTP at 104. Newland and M.M.E. had sex in the trailer.

In early 2014, the principal at M.M.E.'s school contacted M.M.E.'s grandmother when someone reported Newland's relationship with M.M.E. After being confronted by her grandmother, M.M.E. talked with her counselor, Shiloh Reynolds, about her relationship with Newland.

The principal and Reynolds each submitted a referral to law enforcement. M.M.E. gave a taped statement to Deputy Kevin Anderson with the Lewis County Sheriff's Office. Newland was arrested and charged on amended information with three counts of third degree rape of a child.

Before trial, defense counsel told the trial court that the defense "would have objections to parts" of Reynolds's proposed testimony where Reynolds "is basically advising [M.M.E. on] what grooming is." 1 VTP at 17. The trial court responded that, until it heard the question that would be asked, or the response given, it was "not in a position to say categorically that it's not coming in." 1 VTP at 17.

B.     TRIAL TESTIMONY

At trial, the State called Reynolds. Reynolds testified that M.M.E. disclosed to her that M.M.E. had sex three times with a man in his 30s, named Logan, who M.M.E. had met at church. M.M.E. told Reynolds that "he was incredibly nice to her [M.M.E.]. He said nice things to her. She [M.M.E.] said that he told her that he loved her." 1 VTP at 45. The State asked Reynolds what the term "'grooming'" meant and its effect on a child. 1 VTP at 46. The testimony proceeded as follows:

> [Reynolds]: Grooming is a process which somebody who is a sexual predator will engage in with trying to get victims. They will treat them really nice or befriend them or give them gifts or tell them they are going to be there for them for the intent and purposes of winning their trust and to build a relationship with them so that— for the purposes of having a sexual encounter.
>
> [State]:     What is the affect [sic] of that on a child who experiences that?
>
> [Reynolds]: Well, a child can become incredibly attached to an individual. And that's why the process of grooming is used, because that child becomes very attached and doesn't want to betray the individual, doesn't want to lose the love portions or the gifts portions, depending on which route the person, the groomer, takes in building that relationship. It's horrible. It sets that child up for a long time of mistrust and—because it backfires. But also it causes a lot of confusion for the child, because they have grown to trust and love somebody, then they need to protect them. And they have all kinds of mixed feelings and emotions that they can't deal with.
>
> [State]:     Is that phenomena apparent even with 14-year-olds?
>
> [Reynolds]: Certainly. It can go off into—the symptoms of that can go into adulthood, affecting later relationships.
>
> [State]:     Did you have any discussions with [M.M.E.] regarding grooming?
>
> [Reynolds]: I did.
>
> [State]:     What did she say when you explained what that was to her?

4

> [Reynolds]: I told her or she—what did she say? She said that it sounded like what he was doing to her, Logan.

1 VTP at 46-47.

On cross-examination, the defense asked Reynolds about "grooming." The related testimony on cross-examination proceeded as follows:

> [Defense]: Part of the grooming process you said that person will tell this person, the target, that he loved her?
>
> [Reynolds]: That could be a thing that happens with grooming.
>
> [Defense]: Okay. You also said that one thing that could happen would be that they would give gifts to this individual?
>
> [Reynolds]: That could be part of it, yes.
>
> [Defense]: Okay. Did you have any evidence other than what [M.M.E] told you that my client had told her that he loved her?
>
> [Reynolds]: All of my information was just from [M.M.E.].
>
> [Defense]: Okay. Did she ever disclose to you any gifts that my client gave to her?
>
> [Reynolds]: Not that I remember or recall.
>
> . . . .
>
> [Defense]: You are the one that brought up the grooming, correct?
>
> [Reynolds]: After [M.M.E.] disclosed and how she disclosed, yes, I brought that up. That's what came up for me and what she was talking about.

1 VTP at 56-57, 59.

On redirect, the State asked what, specifically, M.M.E. had said that suggested to Reynolds that grooming had occurred. Reynolds responded that it was when M.M.E. relayed that Newland had said "a lot of nice things to her [M.M.E.]," because M.M.E. "was really eating it up and she

5

had pleasure in her eyes when she said he was being very nice to me and he says he loves me.  And the way she said it, it just red flagged it for me."  1 VTP at 61.

On re-cross, the defense challenged Reynolds's suspicion that M.M.E. had been subjected to "grooming."  The testimony proceeded as follows:

[Defense]:    You said that she was more vulnerable because she had family issues?

[Reynolds]:  Mm-hmm.

[Defense]:    And that it's a place where someone gets victimized, correct?

[Reynolds]:  If somebody is in a more vulnerable place, yes, they are more apt to be victimized rather than somebody that has strong supports.

[Defense]:    Isn't it also a situation where somebody in this could just seek out that companionship wherever she could find it?

[Reynolds]:  Would she want to seek it out?

[Defense]:    Yes.

[Reynolds]:  Certainly.  As a depressed person, she was more isolating.  She was crying.  She was angry.  She had some anger.  She was more withdrawn.  I would be working with her on increasing her social supports, and that's something we did work on.

[Defense]:    The isolation and the anger is towards her family, correct?

[Reynolds]:  She has a lot of anger.  I can't say that it was just towards her family.

[Defense]:    But she was having issues with feeling isolated and secluded because of the family issues, correct?

[Reynolds]:  There was a lot of, yeah, family issues.  And there was a number of issues happening. Her father wasn't with her, and that was a hard thing for her.

[Defense]:    Well, would that then send her out seeking relationships where somebody maybe was willing to be a friend to her?

[Reynolds]:  I think if somebody presented themselves as a friend, she may—given whatever they presented for her that was appealing, she may take that.

6

[Defense]: And just because she found somebody like this doesn't mean there was a sexual relationship, does it?

[Reynolds]: If she found a friend or somebody that was kind and nice and said that they loved her doesn't equate to a sexual relationship.

[Defense]: You said it doesn't?

[Reynolds]: It does not equate to a sexual relationship always.

[Defense]: And there is also potential there to embellish to friends and others, correct, about what she's—how she' s finally found somebody that she can trust and is a friend?

[Reynolds]: Yeah, I don't know. I didn't find her to be embellishing. I didn't hear it from anybody else but her. I felt—and I'm really involved in the community and the schools and I hear a lot from a lot of people. And oftentimes I will hear things from people who are embellishing because everyone knows it. I don't think she went out of her way.

1 VTP at 61-63.

The State also called Lisa Wahl to testify. Wahl was a nurse practitioner in the Sexual

Assault and Child Maltreatment Center at Providence St. Peter Hospital. M.M.E. was referred to

Wahl by law enforcement for a medical examination and interview. Relevant to this appeal, Wahl

testified during the State's direct examination that:

She [M.M.E.] was not able to understand that she was 14 years old, and when you are 14 and you have an alleged offender who is 30 years [older], that, in fact, what is happening is that there is a child who is being groomed. Anybody who is having sex with a 14-year-old going through a grooming process of telling them—and these are her words—that he loved her; that he wanted to kidnap her and marry her; that she couldn't tell, because if she did, he would go to jail; that she knew at 14 that it was against the law. And so she blamed herself because she was breaking the law. She had taught his children in the Sunday school class that she taught at church, and she had a lot of misguided ownership of what had happened to her.

2 VTP at 195.

7

On cross-examination, the defense challenged Wahl's statement that M.M.E. had been

groomed. The defense asked:

[Defense]: So in your eyes then is [M.M.E.] victimized just because of the age difference? Because if you accept what she says, that she had sex with my client as a 30-year-old and it's illegal, that in and of itself is a victimization?

[Wahl]: She's a victim on lots of levels, as I explained. Do you want me to talk on that?

[Defense]: Yeah.

[Wahl]: Okay. So if a 14-year-old has been—if a 14-year-old has sex with a 30-year-old, that means that a 30-year-old has enticed a 14-year-old to have sex. A 30-year-old has a lot more global knowledge, coping skills, just general life experience that a 14-year-old budding child into adolescence and into adult does not have. So a 14-year-old is naive. A 30-year-old is not. A 14-year-old is a victim. A 30-year-old is not.

. . . .

[Defense]: At what age does an individual stop being naive?

[Wahl]: Well, we would have to agree on the term "naïve" definition.

[Defense]: Your term. You used it.

[Wahl]: Okay. So what I think of naive is something that I've never done before. This is a new experience that I don't have any knowledge base. I don't have any history to draw from. I don't have that trial and error. I don't have knowledge of relational standards, normative behaviors, I don't have the knowledge of what to expect next. So if a 14-year-old is being told by a 30-year-old that he loves her, he wishes he could marry her and kidnap her, as a 14-year-old, this is all very romantic, because that's all I have to go on is I'm naive. I know nothing more than what is being given to me in the moment.

. . . .

[Defense]: But again, this is all information that you got from [M.M.E.], correct?

[Wahl]: Which piece?

[Defense]: Well, all of it. That she—that my client was telling her he was loving her, he wanted to kidnap her and marry her. This is all coming from [M.M.E.], correct?

[Wahl]: Correct.

[Defense]: You never talked to my client, [Newland,] did you?

[Wahl]: No.

2 VTP at 206-09. Despite Wahl not having previously mentioned "red flags," defense also asked her:

[Defense]: You mentioned several I think you referred to them as red flags. And this had to do with [M.M.E.]'s life, correct?

[Wahl]: Correct.

[Defense]: What were some of those red flags?

[Wahl]: Red flags would be the fact that her mother used drugs and/or alcohol prenatally; that her mother had lost parental access to her at an early age; that her—she was in foster care for a couple of years; that she is estranged from all of her siblings; that one of her brothers was ultimately killed, murdered in a gang-related incident; that her father had her care for a while until there was concern that she had been exposed to him with pornography and masturbation, and then she was again placed into systems; that she was now being cared for by a 74-year-old paternal grandmother who herself has challenging health issues; that she's been bounced from several living situations, but no stable continuity of care that gave her a basis of feeling safe and nurtured and protected over time.

2 VTP at 209-10.

M.M.E. also testified and defense counsel cross-examined M.M.E. on inconsistencies between her testimony, her statement to police, and disclosures she made to her counselor. First, defense counsel pointed out that in her statement to police, M.M.E. said Newland brought a four-wheeler to their meeting the first night, but testified in trial that he brought the four-wheeler the second night. Second, defense counsel asked why M.M.E. had told the police that the first incident

9

had occurred "outside of a vehicle" if her testimony was that Newland only had the four-wheeler the second night. 2 VTP at 153. Third, defense counsel contrasted M.M.E.'s testimony at trial that Newland had not ejaculated inside of her to her statement to police stating that he had done so. Fourth, defense counsel pointed out that M.M.E. had told Reynolds that all three instances had occurred in the summer of 2013, but testified that the third had occurred late in 2013 when it was cold outside.

C.      CLOSING ARGUMENTS

During the State's closing argument, the prosecutor made the following argument:

> So [M.M.E.] gave you a lot of details. She gave details to everybody who has asked along the way, and she's given the same account. They had sex three times: The first time by the river, the second time within a day, and the third time some time later when it was cold.

2 VTP at 281. The prosecutor later added:

> I want to make sure that when you are deliberating on Count I, you are all talking about the same event. So I would suggest to you that you talk about the event that occurred on July 11th. Then when you deliberate on Count II, make sure you are all talking about Count II, the second time, which I believe was on July 12th. And when you are talking about Count III, concentrate on Count III. But make sure you are all on the same page, because it would be unfair to just throw all of these together. You have to consider each count separately and deliberate on each count separately.

2 VTP at 289-90.

During the defense's closing argument, defense counsel directed the jury's attention to the jury instructions and told the jury that "you need to decide each [count] separately. . . . You need to determine each one individually to reach verdicts on all three of them and deliberate on them separately." 2 VTP at 292.

Defense counsel also argued to the jury that "my client's position is that he never had sex with [M.M.E.]." 2 VTP at 299. The State objected to this as "[n]ot in evidence," which the trial court sustained. 2 VTP at 299. Defense counsel continued, "If my client had admitted to Deputy Anderson that he had had sex with [M.M.E.], don't you think that he would have testified to that on the stand?" 2 VTP at 300. When the State objected, the trial court again sustained the objection.

D.      JURY INSTRUCTIONS AND VERDICTS

The defense did not object to any of the jury instructions that were given. The defense also did not attempt to offer any jury instructions that the court determined would not be given.

Newland was convicted of all three counts of third degree rape of a child. Newland appeals.

ANALYSIS

A.      INEFFECTIVE ASSISTANCE OF COUNSEL

Newland argues that he received ineffective assistance of counsel when his attorney failed to object to the testimony presented on the "'grooming' process that 'sexual predator[s]' use to try[]to get 'victims.'" Br. of Appellant at 7 (quoting VTP at 46, 60). We disagree.

1.  Legal Principles

The right to effective assistance of counsel is afforded criminal defendants by the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution. *Strickland v. Washington*, 466 U.S. 668, 685–86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Thomas*, 109 Wn.2d 222, 229, 743 P.2d 816 (1987). To establish ineffective assistance of counsel, Newland must show both deficient performance and resulting prejudice. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Deficient performance occurs when counsel's performance falls below an objective standard of reasonableness. *State v. Stenson*,

132 Wn.2d 668, 705, 940 P.2d 1239 (1997). To show prejudice, Newland must demonstrate that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *McFarland*, 127 Wn.2d at 335. If Newland fails to satisfy either prong, this court need not inquire further. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

There is a strong presumption of effective assistance, and Newland bears the burden of demonstrating the absence of a legitimate strategic or tactical reason for the challenged conduct. *McFarland*, 127 Wn.2d at 336. Decisions on whether and when to object are "classic example[s] of trial tactics." *State v. Madison*, 53 Wn. App. 754, 763, 770 P.2d 662 (1989). "'Only in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal.'" *State v. Johnston*, 143 Wn. App. 1, 19, 177 P.3d 1127, 1137 (2007) (quoting *Madison*, 53 Wn. App. at 763). It is a legitimate trial tactic to forego an objection in circumstances where counsel wishes to avoid highlighting certain evidence. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 714, 101 P.3d 1 (2004). Where a defendant bases his ineffective assistance of counsel claim on trial counsel's failure to object, the defendant must show that the objection would likely have succeeded. *State v. Gerdts*, 136 Wn. App. 720, 727, 150 P.3d 627 (2007).

Generally, "profile testimony that does nothing more than identify a person as a member of a group more likely to commit the charged crime is inadmissible." *State v. Braham*, 67 Wn. App. 930, 936, 841 P.2d 785 (1992). In other words, testimony implying guilt based on the characteristics of known offenders is inadmissible because it invites the jury to conclude that

because a defendant shares some of the characteristics, he is more likely to have committed the crime. *Id.*

2. No Ineffective Assistance

Newland fails to show the absence of a legitimate strategic or tactical reason for defense council not objecting. *McFarland*, 127 Wn.2d at 336. The record shows that rather than object, Newland's defense counsel chose to challenge Reynolds's and Wahl's testimony on Newland's "grooming" of M.M.E.

First, defense counsel used Reynolds's example of gift-giving as a form of grooming to also elicit from Reynolds that M.M.E. had never mentioned Newland giving her any gifts. Second, defense counsel elicited from Reynolds that it was Reynolds, not M.M.E., who suggested that Newland had engaged in grooming M.M.E. Third, defense counsel elicited from Reynolds that M.M.E.'s depression might cause M.M.E. to seek out people who would be willing to be friends with her, and that such friendships did not mean a sexual relationship would follow. Fourth, defense counsel elicited from Wahl other psychological and environmental issues that Wahl considered to be "red flags" in M.M.E.'s life—using a term Reynolds had used earlier in referring to signals of grooming. Finally, defense counsel challenged both Reynolds and Wahl about the sources for their opinions regarding whether M.M.E. was groomed, eliciting from both Reynolds and Wahl that their opinions were formed without seeking information from individuals other than M.M.E.

Thus, defense counsel's failure to object to the testimony was a legitimate trial tactic. Therefore, we hold that Newland's ineffective assistance of counsel argument fails.[3]

B.    LIMITING CLOSING ARGUMENT

Newland argues that the trial court violated his due process rights when it sustained the State's objections during defense counsel's closing argument.  Specifically, Newland contends that, because of the court's rulings, his "attorney was never able to argue that the jury could infer that [Newland] contested M.M.E.'s version of events." Br. of 10-11.  We disagree.

A criminal defendant's "right to counsel encompasses the delivery of closing argument." *State v. Frost*, 160 Wn.2d 765, 768, 161 P.3d 361, 363–64 (2007).  Trial courts have broad "discretion over the scope of closing argument." *Id.* at 768, 772.  Accordingly, we review these challenges for an abuse of discretion. *Id.* at 768.  A trial court abuses its discretion "'only if *no reasonable person* would take the view adopted by the trial court.'" *Id.* at 771 (quoting *State v. Perez–Cervantes*, 141 Wn.2d 468, 475, 6 P.3d 1160 (2000)).  In all cases, the trial court should "'restrict the argument of counsel to the facts in evidence'" and should confine the law to that which is set forth in the jury instructions. *Id.* at 772 (quoting *Perez-Cervantes*, 141 Wn.2d at 475).

Here, the trial court sustained objections to defense counsel's statements of "my client's position is that he never had sex with her" and "[i]f my client had admitted to Deputy Anderson that he had had sex with [M.M.E.], don't you think that he would have testified to that on the

---

[3] This case is distinguishable from *State v. Braham*, 67 Wn. App. 930, 936, 841 P.2d 785 (1992), relied on by Newland.  *Braham* addressed the admissibility of profile evidence based on the defendant's evidentiary challenges; whereas, here, Newland is challenging the testimony as ineffective assistance of counsel.  *Braham*, 67 Wn. App. at 932.  Additionally, here, Reynolds and Wahl had both interviewed and treated M.M.E. in their professional and medical capacities, and so had particular and specific information about M.M.E.'s case.

stand?" 2 VTP at 299-300. The record shows that no testimony or other evidence was presented that stated Newland denied having sex with M.M.E. Therefore, we hold the trial court did not abuse its discretion in limiting defense counsel's closing argument because the trial court was limiting the closing argument to the evidence presented at trial.

Even if the trial court did abuse its discretion in limiting the defense's closing argument, the error was harmless. An erroneous limitation of the scope of closing argument is subject to a harmless error analysis. *Frost*, 160 Wn.2d at 781-82. To find harmless error, we must be "convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error." *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985).

We hold any error was harmless because the argument that defense counsel was making— that Newland denied having sex with M.M.E.—would not have changed the outcome had the trial court allowed counsel to make the argument. The jury already knew that Newland denied having sex with M.M.E. Jury instruction 2 stated, "The defendant has entered pleas of not guilty. Those pleas put in issue every element of each crime charged." Clerk's Papers (CP) at 39. Also, the jury was instructed that the elements of the crimes of third degree rape of a child required the state to prove that Newland had sex with M.M.E.

Thus, the jury was instructed that whether Newland had sex with M.M.E. was at issue. Whether Newland specifically denied having sex with M.M.E. is irrelevant because the jury was still instructed that the burden was on the State to prove beyond a reasonable doubt that Newland had sex with M.M.E. On these instructions, the jury found Newland guilty. Therefore, we hold that even if the court abused its discretion in limiting the defense's closing, the error was harmless.

15

C.     DOUBLE JEOPARDY

Newland argues the trial court violated his right against double jeopardy in failing to instruct the jury that each of the charges for third degree rape of a child needed to be based on a separate and distinct act.  We disagree.

The double jeopardy clauses of the federal and state constitutions protect defendants from being "punished multiple times for the same offense."  *State v. Linton*, 156 Wn.2d 777, 783, 132 P.3d 127 (2006); *see* U.S. CONST. amend. V; WASH. CONST. art. I, § 9.  We review double jeopardy claims de novo.  *State v. Mutch*, 171 Wn.2d 646, 661-62, 254 P.3d 803 (2011).

When the State provides evidence of multiple acts that could constitute more than one of the crimes charged, the trial court should instruct the jury that each count must be based on a separate and distinct act.  *Id.* at 663.  If the instructions do not inform the jury that each count must be based on a separate and distinct act, then we must determine whether the evidence, arguments, and instructions made the separate act requirements "'manifestly apparent to the jury.'"  *Id.* at 664 (emphasis omitted) (quoting *State v. Berg*, 147 Wn. App. 923, 931, 198 P.3d 529 (2008), *overruled in part by Mutch*, 171 Wn.2d at 663–64)).

Newland's argument relies on *Mutch*, 171 Wn.2d 646.  In *Mutch*, our Supreme Court considered whether a jury instruction, identical to the one used in this case, failed to specifically advise the jury that each charged count arose from a "separate and distinct" act and whether this inadequacy created a risk that the jury could have convicted Mutch of five counts of rape based only on a single criminal act.  *Id.* at 662.  Although the court determined that the instruction was inadequate, the court clarified that this deficiency alone was insufficient to justify relief.  *Id.* at 663–64.  Instead, the court held that the deficient instructions must be examined in the context of

the record as a whole to determine if the defendant was actually subjected to multiple punishments for the same offense. *Id.*

The court in *Mutch* then held that given the charging information, the testimony, and the arguments presented, it was "manifestly apparent" that the jury instruction "did not actually effect a double jeopardy violation." *Id.* at 665. The court specifically noted that (1) the information had charged *Mutch* with "five counts based on allegations that constituted five separate units of prosecution," (2) the victim "testified to five separate episodes of rape," and the defense's focus at trial was not centered on the number of rapes but rather whether there was consent and the victim's credibility, (3) the jury was given five to-convict instructions, and (4) "[t]he State discussed all five episodes of rape in its arguments." *Id.*

We agree with Newland that the instruction provided to the jury in this case failed to specifically advise the jury that each count charged arose from a separate and distinct act because the jury instruction used in this case was identical to the one used in *Mutch*.[4] *Compare* 171 Wn.2d at 662 *with* CP at 40. However, as in *Mutch*, we hold that an examination of the record shows that the instructions to the jury did not effect a double jeopardy violation.

---

[4] The jury instruction at issue in *Mutch* stated:

> [a] separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count.

171 Wn.2d at 662 (alteration in original). Here, jury instruction 3 stated:

> A separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count.

Clerk's Papers at 40.

First, M.M.E. testified that she and Newland had sex on three separate occasions—twice by the river on consecutive nights, and a third time in the trailer by the house Newland was house-sitting—which is the exact number of to-convict instructions given. Second, Reynolds, Wahl, and Deputy Anderson also testified that M.M.E. told them she had sex with Newland on three separate occasions. Third, the jury was given three separate to-convict instructions for each of the three counts of third degree rape of a child. Each to-convict instruction specified which charged count the to-convict instruction was for. *See, e.g.*, CP at 45 ("To convict the defendant of the crime of rape of a child in the third degree as charged in Count II, each of the following elements of the crime must be proved beyond a reasonable doubt"). The jury was also provided three verdict forms for each of the three counts of third degree child rape and answered each separately in the affirmative. As with the to-convict instructions, each verdict form specifically referenced the charged count to which it was referring. *See, e.g.*, CP at 56 ("We, the jury, find the defendant, LOGAN JOSEPH NEWLAND guilty [handwritten] of the crime of Rape of a Child in the Third Degree as charged in Count III."). And, finally, the State referenced each of the three charged instances separately in its closing, suggesting that the jury use the first night they had sex, on July 11th, for Count I; the second night they had sex, on July 12th, for Count II; and the third time they had sex for Count III. Therefore, we hold that the record shows that it was made manifestly apparent to the jury that each count charge represented a separate act and that Newland did not establish that he was subjected to multiple punishments for a single criminal act. Accordingly, we hold that Newland's double jeopardy challenge fails.

No. 48416-1-II

D.      APPELLATE COSTS

Newland requests that this court decline to impose appellate costs against him if the State prevails on this appeal and makes a proper request. We will not consider an award of appellate costs at this juncture.

Under *State v. Grant*, 196 Wn. App. 644, 649-50, 385 P.3d 184, (2016), a defendant is not required to address appellate costs in his or her briefing to preserve the ability to object to the imposition of costs after the State files a cost bill. A commissioner of this court will consider whether to award appellate costs in due course under the newly revised provisions of RAP 14.2 if the State decides to file a cost bill and if Newland objects to that cost bill.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Lee, J.

We concur:

_____
Maxa, A.C.J.

_____
Melnick, J.