

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE FEB 22 2018

Fairhurst, C.J.
CHIEF JUSTICE

at 8:00 am on Feb 22, 2018

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of | ) | No. 94185-8 |
| | ) | |
| TODD DALE PHELPS, | ) | En Banc |
| | ) | |
| Petitioner. | ) | |
| | ) | Filed FEB 22 2018 |

JOHNSON, J.—This case involves the issue of whether a prosecutor's closing argument asserting a victim was "groomed" by the defendant, where testimony of grooming was disallowed during trial, constitutes flagrant and ill-intentioned misconduct requiring reversal. The Court of Appeals, Division Two, granted Todd Phelps's personal restraint petition (PRP) and reversed his convictions for third degree rape and sexual misconduct with a minor.[1] The Court of Appeals held that expert testimony is required if the State intends to rely on grooming to argue and prove its case. Thus, because the prosecutor did not provide expert testimony, the Court of Appeals found that the prosecutor argued facts not in evidence during his closing argument. The Court of Appeals held that the

---

[1] The jury also found two aggravating factors: (1) Phelps knew or should have known that A.A., the minor victim, was a particularly vulnerable victim and (2) Phelps used a position of trust to facilitate commission of the crimes.

prosecutor's actions constituted flagrant and ill intentioned misconduct and that Phelps had shown the misconduct caused him actual and substantial prejudice. *In re Pers. Restraint of Phelps*, 197 Wn. App. 653, 389 P.3d 758, *review granted*, 189 Wn.2d 1001, 403 P.3d 38 (2017).

We reverse the Court of Appeals on both issues and hold that under the facts and charges involved in this case, expert testimony on grooming was not required and the use of the term "grooming" during closing argument did not amount to arguing facts not in evidence. The prosecutor also did not commit flagrant and ill-intentioned misconduct, nor has Phelps shown that if misconduct occurred it caused him actual and substantial prejudice.

## FACTS

Phelps was an assistant coach for the Pe Ell School girls' softball team. During the summer of 2010, Phelps took his family and members of the team to tournaments most weekends. One of those team members was A.A., a 16-year-old who had a strained relationship with her own parents. A.A. was dealing with several emotional issues: she cut herself, experienced depression, and had contemplated suicide.

Once softball season started in February 2011, A.A. told Phelps she had been cutting herself and had considered suicide. Over the next several months, Phelps continued to talk with A.A. about her self-harm, her suicidal thoughts, and

2

other personal issues. Phelps also told A.A. personal stories involving his sexual experiences with women. According to A.A., Phelps explained that this was so she could have dirt on him because he now had dirt on her. Over time, Phelps and A.A. developed a relationship of in-person conversations, phone calls, and frequent texts, sometimes late into the night.

Phelps also had A.A. show him where she cut herself at or near the tops of her thighs, which required her to pull her pants halfway down. This happened several times. Each time A.A. showed him her cuts, some kind of sexual contact occurred; the contact escalated each time. During softball team trips, several instances of Phelps inappropriately grabbing parts of A.A.'s body occurred. A.A. eventually told Melody Porter, her youth pastor's wife, that she and Phelps had kissed. Porter reported the kiss to the school superintendent and Phelps was placed on administrative leave.

With A.A.'s parents' consent, Phelps was reinstated as softball coach. Several people, including members of the school board and A.A.'s parents, instructed Phelps not to text A.A. anymore and to maintain an appropriate coach/player relationship. Disregarding these warnings, Phelps and A.A. continued to communicate on a near daily basis. When school officials discovered Phelps and A.A. were still communicating, Phelps was forced to resign as coach in late April

2011 and A.A.'s father told him not to have any further contact with A.A. However, Phelps and A.A. continued to communicate.

Phelps and A.A. met several times in July while A.A. was with a friend. At some point, Phelps talked with a coworker about how he could control A.A.'s emotions. Phelps and A.A. eventually met in private at Phelps's brother's house, where A.A. again showed Phelps her cuts. According to A.A., Phelps then forced her to have sex with him. Soon after, A.A. went to go live with an aunt in Auburn. About two months after the alleged rape occurred, A.A. told her parents she had had sex with Phelps. Her parents called the sheriff and reported the rape.

Phelps was charged with one count of third degree rape and one count of sexual misconduct with a minor. At trial, during voir dire, the prosecutor asked potential jurors if they had ever heard of grooming and if they knew anything about it; several jurors responded. No indication exists in the record that the prosecutor talked about grooming in his opening statement. The focus of the claimed misconduct arises in the context of closing argument.

The term "grooming" came up twice during trial testimony. The first time was during A.A.'s father's testimony. The prosecutor asked him what he thought Phelps's intentions were. Defense counsel objected as to speculation, but the trial judge overruled the objection. A.A.'s father responded, "I believe [Phelps's] intentions were dishonorable. I believe he was grooming her to the end result of

what he did. He ended up raping her on the 27th." 2 Verbatim Report of Proceedings (VRP) (Apr. 18, 2012) at 180. Defense counsel did not object to this response. The second time grooming came up was during the testimony of Yvonne Keller, the other softball coach. The prosecutor asked her if she believed Phelps was grooming A.A. Keller said she did just as defense counsel objected as to her belief. The court sustained the objection. The prosecutor then asked Keller if she knew anything about grooming. Defense counsel objected to relevance, and the judge said, "That's an issue that is for expert testimony. She is not an expert. She's already stated she's not an expert. So I'm sustaining the objection." 2 VRP (Apr. 18, 2012) at 211.

During closing arguments, the prosecutor went through the witnesses' testimony and explained how the evidence showed A.A.'s isolation and vulnerability, how A.A. trusted Phelps, Phelps's position of authority, how Phelps bragged about being able to control A.A.'s emotions, and how Phelps selectively disclosed A.A.'s secrets to others to keep the spotlight on her. The prosecutor also discussed the day of the alleged rape in detail, as well as both A.A.'s and Phelps's credibility.

The prosecutor used the term "groom" or "grooming" 19 times during his argument and rebuttal. He referenced the jurors' remarks during voir dire about grooming. He also pointed out the continuous, secretive nature of grooming, telling

the jury that grooming does not happen out in the open and that it is a constant process happening all the time. He stated that A.A. was a "prime candidate" to be groomed because of her low self-esteem and stressed relationship with her family. 8 VRP (Apr. 26, 2012) at 1540. He argued that Phelps was not only grooming A.A. but also grooming her family and friends around her to make himself appear concerned about A.A.'s mental health. The prosecutor discussed Phelps's repeated efforts to desensitize A.A. to sexual contact, arguing that because of grooming, Phelps knew A.A. was not going to respond to his escalating sexual advances. He used a similar argument to explain Phelps's sexually explicit remarks to A.A. and his efforts to isolate her by having her break up with her boyfriend and stop talking to her counselor. The prosecutor also argued grooming explained some aspects of A.A.'s behavior, such as her efforts to protect Phelps by deleting their text messages and her apparent obsession with him. Toward the end of his closing, the prosecutor told the jury, "We're here because of grooming, we're here because of deceit, concealment, half-truths, misrepresentations." 8 VRP (Apr. 26, 2012) at 1548.

The prosecutor's closing argument was accompanied by 97 PowerPoint slides, 8 of which mentioned grooming. The defense attorney did not object to the prosecutor's use of grooming in his closing argument or to the PowerPoint slides. Phelps's trial defense apparently was that he did not commit the crimes because he

was not there, but even if he did have sex with A.A., she consented. The jury found

Phelps guilty on all counts, including the aggravating circumstances.

Phelps filed an initial appeal. The Court of Appeals, Division Two,

affirmed,[2] and Phelps filed a petition for review, which we denied. *State v. Phelps*,

181 Wn.2d 1030, 340 P.3d 228 (2015). Phelps then filed this PRP in the Court of

Appeals, raising the issue of prosecutorial misconduct. The Court of Appeals

granted the PRP and reversed Phelps's convictions. The State filed a motion for

discretionary review, and we granted review.

## ISSUES

(1) Whether the State is required to present expert testimony if it intends to use the concept of grooming to argue its case to a jury.

(2) Whether, by referencing grooming in closing argument, the prosecutor committed flagrant and ill-intentioned misconduct.

## ANALYSIS

The first issue is whether expert testimony is required when the State uses

the concept of grooming to argue its case to a jury. While we have never addressed

when and under what circumstances expert testimony on grooming is admissible,

several jurisdictions have held it is admissible, but not that it is required. *See Jones*

---

[2] *State v. Phelps*, No. 43557-8-II (Wash. Ct. App. June 17, 2014) (unpublished), http://www.courts.wa.gov/opinions/pdf/D2%2043557-8-II%20%20Unpublished%20Opinion.pdf. The issue of prosecutorial misconduct was raised and rejected by the Court of Appeals in this initial appeal. The State here does not argue that Phelps should be precluded from bringing this second prosecutorial misconduct claim in his PRP.

*v. United States*, 990 A.2d 970, 978 (D.C. 2010); *State v. Berosik*, 2009 MT 260, 352 Mont. 16, 23-24, 214 P.3d 776 (2009); *Morris v. State*, 361 S.W.3d 649, 669 (Tex. Crim. App. 2011). States are divided on whether expert testimony is required where the State intends to use grooming to argue its case. *Compare State v. Akins*, 298 Kan. 592, 315 P.3d 868 (2014), *and State v. Sena*, 2008-NMSC-053, 144 N.M. 821, 192 P.3d 1198, *with Dandass v. State*, ___ So. 3d ___, 2017 WL 1709396, *cert. denied*, 230 So. 3d 1023 (Miss. 2017).

Because this is an evidentiary issue, we evaluate it through the lens of our Rules of Evidence (ER). Washington's rule on expert witnesses provides, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." ER 702. Our rule allows an expert to testify about his or her specialized knowledge if it would help the jury understand the evidence, but the rule does not require expert testimony where it would not be helpful to the jury. It is within the sound discretion of trial judges to determine the admissibility of evidence pursuant to ER 702 and ER 403.

The only published Washington case dealing with expert testimony and grooming is *State v. Braham*, 67 Wn. App. 930, 841 P.2d 785 (1992). In that case, the trial judge, over the defense's objection, allowed an expert to testify on the

8

general characteristics of grooming. In closing argument, the prosecutor exhorted the jury to infer the defendant's guilt based on the expert's testimony. The prosecutor argued the elements of grooming present in that case were substantial circumstantial evidence supporting "'that in fact'" the defendant had molested the child. *Braham*, 67 Wn. App. at 934. The Court of Appeals in reversing held that such profiling evidence implying guilt based on characteristics of known offenders was inadmissible.

In this case, Phelps argues that *Braham* establishes that grooming evidence is per se inadmissible. We disagree. The *Braham* court expressly did not hold "that such evidence will always be inadmissible" and described several situations in which grooming evidence may be appropriate and admissible. *Braham*, 67 Wn. App. at 939. In reversing the defendant's conviction, the *Braham* court was sensitive to the prejudicial effect and weight expert testimony may have for jurors, potentially leading them to consider expert grooming testimony to be evidence of a defendant's guilt. We have similarly recognized the concern that jurors may assign inappropriate weight to expert testimony simply because it comes from someone the court has deemed an expert. *See State v. Black*, 109 Wn.2d 336, 348-49, 745 P.2d 12 (1987).

In Phelps's trial, expert testimony was not offered or admitted by the State. One witness, without objection, opined about Phelps's motivation and testified he

thought Phelps had groomed A.A. After a relevance objection, the trial court disallowed a lay witness to express an opinion on whether she believed Phelps was grooming the victim. Based on this record, this case does not present the issue of under what circumstances expert testimony may be required or allow us to determine whether a trial court's decision to admit expert testimony requires reversal. Instead, we focus on the prosecutor's use of grooming in closing argument and whether the State committed misconduct by arguing facts not admitted during trial.

Once we accept review of a PRP, we review pure questions of law de novo. *In re Pers. Restraint of Coats*, 173 Wn.2d 123, 133, 267 P.3d 324 (2011). Under this standard of review, we discuss the burden as it rests on Phelps to prevail in his PRP; the record must establish the underlying claim he brought in his PRP. A personal restraint petitioner raising a prosecutorial misconduct claim must prove the misconduct was either a constitutional error resulting in actual and substantial prejudice or a fundamental defect resulting in a complete miscarriage of justice. *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 539, 397 P.3d 90 (2017) (citing *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 676-77, 327 P.3d 660 (2014)). This principle arises under the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of the Washington State Constitution, which guarantee the right to a fair trial; prosecutorial misconduct may deprive a

defendant of this right.[3] *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 703-04, 286 P.3d 673 (2012) (plurality opinion).

Because Phelps did not object during trial, his prosecutorial misconduct claim is considered waived unless the misconduct is """"so flagrant and ill-intentioned that it cause[d] an enduring and resulting prejudice that could not have been neutralized by a curative instruction."""" *Lui*, 188 Wn.2d at 539 (alteration in original) (quoting *In re Pers. Restraint of Caldellis*, 187 Wn.2d 127, 143, 385 P.3d 135 (2016) (quoting *State v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546 (1997))). When evaluating whether misconduct is flagrant and ill intentioned, we "focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." *State v. Emery*, 174 Wn.2d 741, 762, 278 P.3d 653 (2012). In other words, prosecutorial misconduct is flagrant and ill intentioned only when it crosses the line of denying a defendant a fair trial.

Put simply, to prevail in his PRP, Phelps must overcome three hurdles. First, he must show the prosecutor committed misconduct. Second, because he did not object during trial, Phelps must show that misconduct was flagrant and ill-intentioned and caused him prejudice incurable by a jury instruction. Third,

---

[3] The State argues we should use the term "prosecutorial error" rather than "prosecutorial misconduct." Mot. for Discr. Review at 12-13. We decline to address this argument. "Prosecutorial misconduct" is a legal term of art, and we use it as such. Continuity of the use of this term is also necessary for research purposes in that a case search for "prosecutorial error" might not locate prosecutorial misconduct cases.

because he raises this issue in a PRP, Phelps must show the prosecutor's flagrant and ill-intentioned misconduct caused him actual and substantial prejudice. We address each of these hurdles in turn.

The Court of Appeals held that in arguing grooming to the jury without presenting expert testimony, the prosecutor argued facts not in evidence, which constituted flagrant and ill-intentioned misconduct. First, we must determine if the prosecutor committed misconduct. Because the underlying claim is the prosecutor argued facts not in evidence, we must discuss in general terms what a fact is. A "fact" is "[s]omething that actually exists; an aspect of reality." BLACK'S LAW DICTIONARY 709 (10th ed. 2014). A "fact in evidence" is "[a] fact that a tribunal considers in reaching a conclusion." BLACK'S, *supra*, at 710. An "inference," on the other hand, is "[a] conclusion reached by considering other facts and deducing a logical consequence from them." BLACK'S, *supra*, at 897.

Definitions are only marginally helpful; there are no objective criteria to distinguish between facts, inferences, and facts not in evidence. Facts are the responses to the "who, what, where" questions prosecutors ask at trial. Witnesses respond with their versions of the events giving rise to the charges through which the State establishes the elements of the offense. In contrast, prosecutors have "wide latitude to argue reasonable inferences from the evidence, including evidence respecting the credibility of witnesses." *State v. Thorgerson*, 172 Wn.2d

12

438, 448, 258 P.3d 43 (2011). Prosecutors are free to argue their characterization of the facts presented at trial and what inferences these facts suggest in closing argument. Jurors are also specifically instructed not to consider closing arguments as evidence, which further helps draw the line between fact and argument. 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 1.02, at 21 (4th ed. 2016).

Depending on how the concept is used, grooming can be a fact. For example, the prosecutor in *Braham* argued that because aspects of grooming were present in that case, their presence was circumstantial evidence of the defendant's guilt. Thus, the prosecutor in that case encouraged the jury to consider grooming as a fact in evidence in reaching its ultimate conclusion about the defendant's guilt, which the *Braham* court held was impermissible and reversed.

Here, the prosecutor was not using grooming in the same manner. Instead, he used grooming to paint a picture of the evidence for the jury. Grooming is descriptive of how Phelps's and A.A.'s relationship began, developed, and expanded and in reality has or adds little value to what the State needed to prove: that Phelps committed the crimes. The facts and the way the facts fit together are two different things. The prosecutor's comments connecting the evidence to grooming are more akin to permissible inferences drawn from the evidence than arguing facts not in evidence.

The Court of Appeals held the prosecutor had committed misconduct, in part, because the grooming evidence was intended to rebut Phelps's claims that he was merely trying to help A.A. deal with her personal issues. *Phelps*, 197 Wn. App. at 682-83. However, it is not misconduct for a prosecutor to argue the evidence does not support the defense theory; prosecutors are entitled to respond to defense counsel's arguments. *State v. Russell*, 125 Wn.2d 24, 87, 882 P.2d 747 (1994). Whether the defense's theory that Phelps was genuinely concerned about A.A. and thus maintained contact with her has no bearing on the jury's ultimate determination of whether Phelps committed the crimes of which he was accused.[4] Likewise, whether Phelps actually groomed A.A., per the prosecutor's theory, is similarly establishing the background of Phelps's and A.A.'s relationship and is not key to the jury's determination of Phelps's guilt.

Especially in this case, which involved the aggravators of abuse of trust and vulnerability, the prosecutor understandably explained the evidence in the context of Phelps's relationship with A.A. to establish a basis for these aggravating circumstances. Even if prohibited from using the term "grooming" without expert testimony, the prosecutor could have explained the evidence using grooming-related concepts, such as developing trust, isolation, and manipulation. We have

---

[4] Defense counsel also referenced grooming several times in his closing argument, which somewhat weakens Phelps's claim that the prosecutor's use of grooming denied him a fair trial. *See Russell*, 125 Wn.2d at 89.

never held that jurors need expert testimony to establish that a defendant manipulated or controlled someone; jurors can understand these concepts based on common sense and experience. We have trouble envisioning a world in which experts must be called into court to explain trusting relationships to jurors. Indeed, expert testimony may have lent inappropriate weight to the issue of grooming, which did not go to the ultimate determination of Phelps's guilt.

The State argues the prosecutor could have replaced "groomed" with the word "manipulated" for the same effect in closing argument. We agree. The State did, in fact, use those words interchangeably during its closing argument. *See* 8 VRP (Apr. 26, 2012) at 1540 (describing A.A. as "a prime candidate for grooming, to be manipulated"). Little meaningful difference exists between the prosecutor's comments and arguing Phelps had developed a "trusting relationship" with A.A. or manipulated her. Various witnesses testified about Phelps's interactions with A.A. and her family, her vulnerability as a troubled teenager, and the evolution of Phelps's relationship with her.[5] The prosecutor summarized this extensive testimony, alluding to grooming only in that it was relevant to the context of Phelps's and A.A.'s relationship. We find no support for Phelps's claim the prosecutor presented his own invented definition of grooming to the jury, and even

---

[5] The value of A.A.'s father's comment that he believed Phelps had groomed her is debatable, but it is undisputed that that testimony was admitted.

if this were the case, prosecutors are free to characterize the evidence to tell their story in closing argument. Furthermore, the jury was instructed closing arguments were not evidence and it could consider only the testimony and exhibits in reaching its verdict.

We also find no suggestion the prosecutor used grooming as profiling evidence or to argue Phelps was guilty because he had engaged in grooming.[6] The prosecutor thoroughly discussed the date of the rape itself, and any credibility arguments he made centered on the differences between Phelps's and A.A.'s accounts of what happened that day. We hold the prosecutor in this case did not commit misconduct. He did not argue facts not in evidence, and his comments in closing argument were not central to the verdict reached by the jury.[7]

It is the responsibility of trial courts to apply the standards for admissibility of expert testimony under ER 702 and the Rules of Evidence. Unlike closing arguments, which jurors are specifically instructed are not evidence, there is no similar instruction offering jurors guidance on how to interpret expert testimony, which is offered to them as evidence or to assist in understanding

---

[6] While the State argued that Phelps "was grooming everybody else," 8 VRP (Apr. 26, 2012) at 1591, in context it was referring to Phelps's manipulation of the people surrounding A.A., not Phelps's grooming of other girls or propensity to groom. Propensity evidence is generally inadmissible under ER 404.

[7] Because we hold the prosecutor did not commit misconduct, Phelps's ineffective assistance of counsel claims of both trial and appellate counsel necessarily fail.

evidence. As alluded to earlier, cases express concern about the weight jurors might give to an expert opinion, so trial courts should be hesitant to admit expert testimony on grooming. We reverse the Court of Appeals and hold the concept of grooming, as used in this case, is within the common knowledge of jurors and the State was not required to present expert testimony to argue grooming to the jury. Our holding is consistent with *Braham,* which discourages the use of expert testimony on grooming except in certain limited circumstances. That is not to say that expert testimony may never be offered; there may be instances where expert testimony could be admissible and appropriate. Nor does our holding allow grooming evidence to be offered for any purpose; under *Braham,* grooming evidence may not be introduced as profiling evidence, or as circumstantial evidence of a defendant's guilt. Phelps fails to overcome the first hurdle to prevail on his PRP.

Even if we were to hold that the prosecutor argued facts in evidence through his use of the term "grooming," Phelps cannot overcome the second hurdle of proving any misconduct was flagrant and ill intentioned. We have found prosecutorial misconduct to be flagrant and ill intentioned in a narrow set of cases where we were concerned about the jury drawing improper inferences from the evidence, such as those comments alluding to race or a defendant's membership in a particular group, or where the prosecutor otherwise comments on the evidence in

an inflammatory manner. *See State v. Monday*, 171 Wn.2d 667, 257 P.3d 551 (2011); *State v. Belgarde*, 110 Wn.2d 504, 508, 755 P.2d 174 (1988) (holding a prosecutor committed flagrant and ill-intentioned misconduct by telling the jury the defendant in a murder trial was "'strong'" with the American Indian Movement (AIM) and calling AIM a "'deadly group of madmen'" and "'butchers that kill indiscriminately'"); *Glasmann*, 175 Wn.2d at 701-02 (holding it was flagrant and ill-intentioned misconduct for a prosecutor to present slides of the defendant's booking photograph with words like "'GUILTY'" and "'WHY SHOULD YOU BELIEVE ANYTHING HE SAYS ABOUT THE ASSAULT?'" superimposed over the photograph in bold red letters).

For example, in *Monday*, the prosecutor called attention to the fact that some of the witnesses were African-American by imitating their pronunciation of words during direct examination and arguing a "'code'" that said "'black folk don't testify against black folk'" explained why certain witnesses were reluctant to testify against the defendant. *Monday*, 171 Wn.2d at 674. The defendant appealed based on prosecutorial misconduct because the prosecutor had made an appeal to racial prejudice to undermine the credibility of witnesses based on their race. The State argued the evidence against the defendant was overwhelming. However, we reversed the defendant's conviction, holding the misconduct was flagrant and ill intentioned because "[t]he notion that [a prosecutor] should seek to achieve a

18

conviction by resorting to racist arguments is so fundamentally opposed to our founding principles, values, and fabric of our justice system that it should not need to be explained." *Monday*, 171 Wn.2d at 680. The cases establish in what settings misconduct amounts to inexcusable behavior that compromises the fairness of a defendant's trial.

Here, even assuming the prosecutor had committed misconduct, the misconduct did not cross the line into areas of conduct that would have threatened the fundamental fairness of his trial. The grooming comments did not rise to the level of being inflammatory, nor did they come close to the level of severity our precedent suggests is necessary to meet the "flagrant and ill intentioned" standard.

Also, in some cases we have factored in an inquiry whether a jury instruction could have cured the alleged misconduct. *See Emery*, 174 Wn.2d at 762-65; *State v. Warren*, 165 Wn.2d 17, 29-30, 195 P.3d 940 (2008). Here, Phelps has not shown any prejudice incurable by a jury instruction. Closing arguments are not evidence, and the jury here was given an instruction to that effect. 8 VRP (Apr. 26, 2012) at 1476. Jurors are presumed to follow the court's instructions. *State v. Hopson*, 113 Wn.2d 273, 287, 778 P.2d 1014 (1989).

Finally, even if we were to find flagrant and ill-intentioned misconduct, Phelps does not overcome the third hurdle of actual and substantial prejudice required for him to prevail on his PRP. The Court of Appeals was concerned about

the sufficiency of the evidence, but that is not the analysis we engage in to establish prejudice in the context of a PRP. *Glasmann*, 175 Wn.2d at 711 ("deciding whether reversal is required is not a matter of whether there is sufficient evidence to justify upholding the verdicts"). The proper inquiry is whether there is a substantial likelihood the misconduct affected the jury's verdict. *Glasmann*, 175 Wn.2d at 711 (citing *State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003)).

Phelps does not point out where in closing argument the prosecutor's use of grooming affected the jury's determination of Phelps's guilt regarding the substantive crimes. As we have discussed, the prosecutor's use of the term "grooming" was similar to arguing Phelps had manipulated, controlled, or influenced A.A. Grooming was not central to proving the elements of the crime. Instead, the prosecutor used grooming to describe the context of Phelps's and A.A.'s relationship and how it evolved leading up to the incident.[8] Phelps does not establish actual and substantial prejudice as a result of the prosecutor's use of grooming in closing argument.

---

[8] The evidence of how the relationship developed and evolved tended to be more specific to the aggravating circumstances found by the jury of abuse of trust and particular vulnerability.

*In re Pers. Restraint of Phelps*, No. 94185-8

We reverse the Court of Appeals and dismiss Phelps's PRP.

WE CONCUR:

No. 94185-8

FAIRHURST, C.J. (concurring)—I disagree with the majority on three issues. I

would hold that (1) expert testimony is necessary to introduce grooming evidence, (2)

the prosecutor engaged in misconduct by arguing facts not in evidence, and (3) under

these facts "grooming evidence" constitutes inadmissible profiling evidence because

the prosecutor's arguments implicitly invited the jury to infer guilt based on the

characteristics of known offenders. *See State v. Braham*, 67 Wn. App. 930, 937, 841

P.2d 785 (1992). Despite my disagreement, I respectfully concur with the majority's

conclusion that reversal is not warranted because Todd Dale Phelps cannot establish a

substantial likelihood that the prosecutor's misconduct affected the jury's verdict. *In re*

*Pers. Restraint of Glasmann*, 175 Wn.2d 696, 711, 286 P.3d 673 (2012) (plurality

opinion).

## I.    ANALYSIS

This court has never addressed the admissibility of expert testimony on

grooming. Prior to this case, only two Court of Appeals opinions addressed this issue.

*State v. Quigg*, 72 Wn. App. 828, 866 P.2d 655 (1994); *Braham*, 67 Wn. App. at 937. In *Quigg*, the court held that the prosecutor's witness was qualified as an expert to testify on grooming because she had over a decade of relevant professional experience. 72 Wn. App. at 837. The court declined to address any other issues relating to the admissibility of expert grooming testimony because the defendant failed to object to those issues at trial. *Id.* at 836-37.

In *Braham*, the Court of Appeals held that expert grooming testimony used as circumstantial evidence of guilt was improper profiling evidence. 67 Wn. App. at 937. In that case, Howard Braham was charged with first degree child molestation after allegedly touching a child who was, along with her mother, living with Braham for three weeks. *Id.* at 931. The State indicated during pretrial motions that it intended to call the director of research for the Harborview Sexual Assault Center to present expert testimony regarding the "'grooming process.'" *Id.* at 932. Braham's attorney objected to this evidence on the grounds that it would be irrelevant and misleading to the jury. *Id.* The judge allowed the expert to testify after the prosecutor assured the judge that the testimony was "'highly relevant'" because Braham and the victim had a "'close relationship.'" *Id.* at 932.

The expert testified generally about the process of grooming but did not mention anything specific about Braham or the victim:

"[T]hat . . . clinical term . . . has been applied to what we would call a process of victimization. . . . [W]hat is basically meant by that is that in most cases where sexual abuse happens, it isn't something that just happens suddenly out of the blue. Generally there is a period of time where the person who intends to abuse the child gradually gets the child to feel more comfortable and may gradually sexualize the relationship or form a bond with the child so that the child will either not understand that what's happening to them is wrong or the child will not tell anyone about it after it happens."

*Id.* at 933 (alterations in original). The prosecutor referenced the expert testimony during closing arguments, concluding that the elements of grooming were present because the evidence showed that Braham had a close relationship with the victim and that the victim fit the profile of a "'[y]oung, articulate, engaging young girl, needy, wanting a father figure.'" *Id.* at 934. The prosecutor went on to assert that Braham's grooming behavior was circumstantial evidence of his guilt. "'[T]he elements or characteristics of . . . grooming . . . *are substantial circumstantial evidence supporting the fact that in fact the defendant did sexually touch her on her vagina in that bedroom.*'" *Id.* at 937 (alterations in original). Braham was found guilty of first degree child molestation and appealed.

On appeal, Braham argued that the trial court improperly admitted expert testimony about the grooming process because it was, in fact, profile testimony. "As a general rule, profile testimony that does nothing more than identify a person as a member of a group more likely to commit the charged crime is inadmissible owing to its relative lack of probative value compared to the danger of its unfair prejudice." *Id.*

at 936. The Court of Appeals argued and concluded that the grooming testimony should have been excluded because it had "virtually no probative value under ER 401" and was unfairly prejudicial.[1] *Id.* at 938-39. The court explained that grooming testimony had little probative value because, contrary to what the prosecutor told the trial court, it was not needed to show that Braham had a greater opportunity to commit the crime:

> Indeed, we are unable to conceive of any basis for [the] admission [of grooming testimony] in this case. Surely, expert opinion is not necessary to explain that an adult in a "close relationship" with a child will have greater *opportunity* to engage in the alleged sexual misconduct. Under the facts presented here, we see no other value to this evidence.

*Id.* at 937-38. The court held that the "prosecutor exhorted the jury to infer guilt based on [the expert's] testimony," *id.* at 937, and that the testimony was particularly prejudicial because it establishes the profile of a typical perpetrator rather than a typical victim:

> The unwarranted implication of guilt is particularly prejudicial where, as here, the expert testimony establishes a profile of the typical perpetrator rather than the typical victim. Perpetrator profile testimony clearly carries with it the implied opinion that the defendant is the sort of person who would engage in the alleged act, and therefore did it in *this* case too.

---

[1] The court refrained from holding that such evidence will always be inadmissible, explaining that expert testimony on grooming may be more probative under different circumstances. For example, grooming evidence may be admissible if offered as rebuttal evidence after the defense claims a perpetrator's conduct is inconsistent with those who commit abuse or rape. *Braham*, 67 Wn. App. at 938. It may also be admissible to explain a victim's behavior, such as delayed reporting. *Id.* at 938 n.5.

*Id.* at 939 n.6. The court held that the erroneous admission of grooming evidence could have affected jury deliberations and reversed and remanded for a new trial. *Id.* at 940.

In the instant case, the prosecutor used the term "grooming" or "groomed" in front of the jury more than 30 times without introducing lay or expert testimony. During voir dire, the prosecutor explicitly introduced the concept of grooming in the context of rape and child molestation and discussed grooming at length with nine potential jurors:

> [PROSECUTOR]: Now, has anyone here heard in the realm of *sexual assault, rape, child molestation,* anything like that, has anyone heard of the word *grooming*? Raise your hand, please.
>
> Number 10, *grooming,* what does that mean to you?
>
> JUROR NO. 10: *Grooming,* the context I'm thinking of is *grooming* of a *victim* to be *assaulted.*
>
> [PROSECUTOR]: Okay. Can you elaborate a little bit for me?
>
> JUROR NO. 10: Well, yeah. Spending time with the child or with the -- you know, with the *victim,* gaining trust of the *victim,* basically preparing the *victim* to make the next move.
>
> [PROSECUTOR]: Okay. Did everybody hear that? Anybody not hear it?
>
> . . . .
>
> [PROSECUTOR]: Right. Okay. So is that part of the process, the perpetrator when they're *grooming* not just the *victim* but other folks around the *victim* maybe? Just what you said --
>
> JUROR NO. 9: Well, I suppose it could be. I don't know.

. . . .

[PROSECUTOR]: Okay. Now, but what about isolating them from their other friends? Is that something that . . . I'm just throwing these out here, I mean, if you're not familiar with any of these. But please speak up if you are.

Number 21, is that a -- if you're *grooming* someone and you're trying to gain a trust relationship to groom them, is it possible that you're going to try to isolate that victim from the other people that victim trusts in their life?

JUROR NO. 21: Yeah.

1 Verbatim Report of Proceedings (VRP) Voir Dire (Apr. 17, 2012) at 113-16 (emphasis added) (last alteration in original).

During the State's redirect of a witness, the prosecutor asked the witness if she "kn[e]w anything about grooming." 2 VRP (Apr. 18, 2012) at 211. Phelps objected, arguing relevance. The trial court sustained the objection, stating, "That's an issue that is for expert testimony. She is not an expert. She's already stated she's not an expert. So I'm sustaining the objection." *Id.* Despite this declaration from the judge, the State proceeded to discuss grooming without introducing any expert testimony on the grooming process.

In closing, the prosecutor discussed different ways that a perpetrator can groom a victim and those around a victim. He referenced the discussion in voir dire:

Then we talked about *grooming*. We talked about the process of *grooming*. And some people came up with examples of how someone who is *grooming* is going to be nice. They are going to try to get the trust of

- 6 -

someone. They are going to try and isolate that person so that they can do an act against this person who is being *groomed*. And it's not just the person who is being *groomed*, but it's other people that are around as well that are being *groomed*.

8 VRP (Apr. 26, 2012) at 1493 (emphasis added). The prosecutor then proceeded to

tell the jury that Phelps' behavior was "called grooming." *Id.* at 1549. "The iPod texts

deleted, again, by [A.A.] to protect him. So where are we at? So now we're in a position

where [A.A.] has to pay because she tried to protect him. Do you know what this is

called? It's called *grooming*. And she was *groomed* well." *Id.* (emphasis added).[2] In

summing up his argument, the prosecutor implied that the case is actually about

grooming:

> So why are we here? We're here because of *grooming*, we're here because of deceit, concealment, half-truths, misrepresentations. And there's only one adult in this entire case who had control over everything that happened in this case. One person who had the control and the authority to control the flow of information and the people involved. And that's that guy right there.

*Id.* at 1548 (emphasis added). During rebuttal, the prosecutor argued that grooming

explains why Phelps did not call Child Protective Services (CPS):

> As concerned as the defendant was for [A.A.], not one time, we haven't heard any information that he ever called CPS, that he ever called law enforcement, nothing. That's how concerned he was. *He was grooming everybody else.* Remember, he was the one that was putting out the severe information that she was going to commit suicide. Everybody

---

[2]The prosecutor even claimed, repeatedly, that Phelps was grooming the other adults in A.A.'s life—but there is no support in the expert testimony provided in other published cases in Washington that the concept of grooming applies to anyone other than the victim. *See Quigg*, 72 Wn. App. 828.

else was familiar with it. And he was the one telling his family, hey, this is a real big deal. Think it was played up quite a bit.

*Id.* at 1591. During closing argument and rebuttal, the prosecutor used the term "grooming" or "groomed" a total of 26 times and displayed the word "grooming" or "groomed" on 8 different PowerPoint slides. *Id.* at 1493-1553, 1580-91 (closing and rebuttal); Pers. Restraint Pet., App. 1.

The majority suggests that grooming is a concept within the common knowledge of jurors and argues that grooming evidence need not be introduced through expert testimony.[3] I respectfully disagree. The dictionary defines the verb "groom" as

> **a :** to attend to the cleaning of (as an animal); *esp* : to maintain the health and condition of the coat of (as a horse) by brushing, combing, currying, or similar attention . . . **b :** to bring about or increase the acceptability or attractiveness of (as one's physical appearance) esp. by carefully attending to details of cleanliness and neatness : freshen up : spruce up . . . make neat . . . **d :** to get into readiness for some specific objective.

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1001 (2002).

"Grooming," in the sexual assault context, refers to a calculated pattern of psychological behaviors used by sex offenders to gain the trust of potential victims before assaulting them. Marjorie A. Shields, Annotation, *Admissibility of Expert*

---

[3]The majority does not explain what the definition of "grooming" is or whether that definition is within the common knowledge of jurors. The majority simply says that "[w]e have never held that jurors need expert testimony to establish that a defendant manipulated or controlled someone; jurors can understand these concepts based on common sense and experience." Majority at 15. The majority goes on to say that "grooming" can be used interchangeably with "manipulating" and suggests that the concept of "grooming" is related to the concepts of "developing trust" and "isolation." *Id.*

*Testimony on Grooming Behavior Involving Sexual Conduct with Child*, 13 A.L.R.7th, Art. 9, §§ 1-2 (2016). The court in *Quigg* explained that grooming was "a process by which child molesters gradually introduce their victims to more and more explicit sexual conduct." *Quigg*, 72 Wn. App. at 833. The fact that the prosecutor specifically said that he was interested in discussing grooming "'in the realm of sexual assault, rape, [and] child molestation'" strongly suggests that the prosecutor intended to invoke the psychological, rather than the ordinary, definition of "grooming." *In re Pers. Restraint of Phelps*, 197 Wn. App. 653, 663, 389 P.3d 758 (2017) (quoting 1 VRP Voir Dire at 113).

The majority concludes that the prosecutor did not need to introduce grooming evidence through an expert witness here because the prosecutor did not use grooming as a fact in evidence. "[The prosecutor] used grooming to paint a picture of the evidence for the jury. Grooming is descriptive of how Phelps's and A.A.'s relationship began, developed, and expanded and in reality has or adds little value to what the State needed to prove: that Phelps committed the crimes." Majority at 13. The record suggests that the prosecutor provided the jury with his own definition of "grooming" and told the jury that Phelps met that definition. In closing argument he presented the jury with PowerPoint slides that said, "GROOMING – NICE, TRUST, ISOLATE" and "GROOMING – NEVER IN THE OPEN," then showed a list of Phelps' behaviors with the word **"GROOMING"** in bold at the top. Pers. Restraint Pet., App. 1, at 14,

- 9 -

34, 81. The prosecutor then proceeded to tell the jury, repeatedly, that Phelps' behavior constituted grooming:

> What is all this stuff that's going on? What is all this physical contact between a coach and a student athlete? It's *grooming*; it's okay, every time I touch you, it's okay, it's okay. Eventually, it becomes the norm. The *grooming* isn't in the open, folks. When people *groom*, they don't do it so everybody can see. That's not the way it works. It wouldn't be called *grooming*. It would be called a crime because he'd be caught all the time.

8 VRP at 1506-07 (emphasis added). "He leans into the seat, and it's dark out, and he takes his hand and puts it between her legs. Again, *grooming*. He already knows she's not going to respond." *Id.* at 1513 (emphasis added). "What I am suggesting is he was *grooming* her just like he was *grooming* everybody else, that these issues are [A.A.'s], and he's not a bad guy." *Id.* at 1517-18 (emphasis added). "These are the things that are going on that she's being told and *groomed* with throughout their contacts." *Id.* at 1522 (emphasis added). "She's a prime candidate for *grooming*, to be manipulated. And that's exactly what happened in this case." *Id.* at 1540 (emphasis added). "She says [A.A.'s] obsessed with her dad. Maybe that might be true. Maybe she was. But she's being *groomed.*" *Id.* at 1542 (emphasis added).

When the prosecutor gave the jury his own definition of "grooming behavior" and asserted that Phelps' behavior falls within that definition, the prosecutor was, in essence, saying that Phelps' behavior is consistent with a specific set of calculated

psychological behaviors. The prosecutor does not get to provide, through argument, facts not in evidence.

The Court of Appeals correctly determined that "[t]he psychological complexities in understanding and evaluating the grooming process demand expert testimony to aid the jury." *Phelps*, 197 Wn. App at 679.[4] Courts in other states and federal circuits recognize that grooming testimony requires specialized knowledge and falls within the scope of ER 702, governing the admissibility of expert testimony. *See, e.g., State v. Berosik*, 2009 MT 260, 352 Mont. 16, 23, 214 P.3d 776; *State v. Sorabella*, 277 Conn. 155, 211-14, 891 A.2d 897 (2006); *Morris v. State*, 361 S.W.3d 649, 659-62 (Tex. Crim. App. 2011); *State v. Akins*, 298 Kan. 592, 315 P.3d 868 (2014); Shields, *supra*, 13 A.L.R.7th, § 4 (explaining that expert testimony on grooming has been ruled admissible by the Third, Fifth, Seventh, Ninth, and Tenth United States Circuit Courts of Appeals and the courts of 15 different states plus the District of Columbia). Because grooming testimony requires specialized knowledge and falls within the scope of ER 702, it necessarily falls *outside* the scope of ER 701, precluding its introduction through

---

[4]Whether grooming evidence requires expert testimony is an issue of first impression in Washington, but our case law strongly suggests that evidence of a specific psychological profile is properly introduced through expert testimony. *See, e.g., Quigg*, 72 Wn. App. at 837 (holding that an expert was qualified to testify about the grooming process); *State v. Allery*, 101 Wn.2d 591, 682 P.2d 312 (1984) (evidence of battered women's syndrome introduced through expert testimony); *State v. Ciskie*, 110 Wn.2d 263, 751 P.2d 1165 (1988) (same); *State v. Janes*, 121 Wn.2d 220, 850 P.2d 495 (1993) (evidence of battered child syndrome introduced through expert testimony).

lay testimony. *See* ER 701. Thus, grooming testimony, if admissible under ER 403, may only be introduced through an expert witness. *See* ER 701, 702.

Even when grooming evidence is introduced through expert testimony, the trial court must be careful to ensure it does not constitute improper profiling evidence. The majority holds that the State's use of grooming here does not constitute improper profiling evidence because *Braham* is factually distinguishable. Specifically, the majority distinguishes *Braham* on the grounds that the prosecutor in this case did not use grooming behavior as circumstantial evidence of the defendant's guilt. I respectfully disagree. Just like in this case, the prosecutor in *Braham* charged the defendant with child molestation—a crime that does not require proof of grooming behavior. RCW 9A.44.083. And just like in this case, the prosecutor's closing arguments in *Braham* focused on characterizing the defendant's actions as grooming:

> "[The expert] told you that it is typical in grooming, the offender is going to have a relationship of some kind with the victim. In this case it was almost a father-daughter relationship. . . . [A.H.] likes Uncle Craigie. He is her daddy at a time when she doesn't have her own dad there. . . .
>
> ". . . .
>
> "[T]he elements or characteristics of . . . grooming that [the expert] explained to you this morning [are here]."

67 Wn. App. at 934 (some alterations in original).

The court in *Braham* held that the State's grooming arguments were unduly prejudicial because they implied guilt based on the characteristics of known offenders.

"Expert testimony implying guilt based on the characteristics of known offenders is the sort of testimony deemed unduly prejudicial and therefore inadmissible. This was exactly how the State used Ms. Berliner's testimony in this case." *Id.* at 937 (citations omitted). I think the prosecutor's grooming arguments in this case are just as prejudicial as the arguments in *Braham*. By referencing grooming behavior 30 times over the course of the trial, the prosecutor implicitly invited the jury to associate the defendant with a group of people more likely to commit the crime. *See id.* at 939 n.6 ("Perpetrator profile testimony clearly carries with it the implied opinion that the defendant is the sort of person who would engage in the alleged act, and therefore did it in *this* case too."). Under these facts, the risk of unfair prejudice associated with the concept of grooming is substantially outweighed by the probative value of the evidence.[5] Thus, even if the prosecutor had attempted to introduce expert testimony on grooming, that testimony would be inadmissible under ER 403.

The main difference between this case and *Braham* is that the prosecutor in this case did not introduce any expert testimony to establish a foundation for his grooming arguments. In my view, this error compounds the seriousness of his misconduct—not

---

[5]Grooming evidence is no more probative here than it was in *Braham*. The court in *Braham* explained that grooming evidence is irrelevant because it is not necessary to explain that an adult in a close relationship with a child will have a greater opportunity to engage in sexual misconduct. 67 Wn. App. at 937-38. The same reasoning applies here—grooming evidence is not necessary to explain that a softball coach with a close relationship to a young player will have a greater opportunity for misconduct. Furthermore, arguing that Phelps was grooming others around A.A. is certainly not necessary to prove that Phelps was guilty of molesting A.A.

only did the prosecutor introduce improper profiling testimony but the prosecutor introduced it himself without an expert witness. However, because Phelps failed to object at trial, these errors are waived unless he establishes that the misconduct was so flagrant and ill intentioned that no instruction could have cured the resulting prejudice. *See Glasmann*, 175 Wn.2d at 704. Repeated references to inadmissible and inflammatory evidence constitute serious misconduct, but in my view, the resulting prejudice could have been neutralized by a curative instruction. Reluctantly, I agree with the majority that reversal is unwarranted because Phelps cannot establish a substantial likelihood that the misconduct affected the jury's verdict. Majority at 20; *Glasmann*, 175 Wn.2d at 711.

Fairhurst, C.J.

Madsen, J.

Wiggins, J.

No. 94185-8

GONZÁLEZ, J. (concurring)—I fully join the majority but write separately to discuss the term of art "prosecutorial misconduct." The State makes a convincing argument for us to stop using "misconduct" to describe mistakes made by prosecutors because of how harsh the label is and because of the consequences for individual prosecutors who commit error. Mot. for Discr. Review at 13 ("When courts use the word 'misconduct' . . . it perpetuates a confusion to the general public that every instance of 'prosecutorial misconduct' is the equivalent of professional misconduct.").

The same observation applies to similarly harsh labels describing the erroneous conduct of judges and criminal defense lawyers. We use equally unforgiving labels to describe trial judge errors as an "abuse of discretion" and mistakes by criminal defense lawyers as "ineffective assistance of counsel." We do not find easily, or take lightly, misconduct, abuses of discretion, or ineffectiveness.

My worry is that if we replace these terms of art with softer labels, we may make the findings more often. The labels themselves should give us pause before reaching such conclusions. While I am open to reconsidering this view, I am not there yet.

González, J.